Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/19/2021 09:07 AM CST

Dwayne Burton, appellee, v.
Alexandra Schlegel,
appellant.

___ N.W.2d ___

Filed January 19, 2021.    No. A-19-1208.

1. **Child Custody: Appeal and Error.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Child Custody.** In cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. If this burden is met, then the court must make a determination of whether removal from the jurisdiction is appropriate.

3. **Modification of Decree: Child Custody: Words and Phrases.** In cases involving the modification of child custody, a material change of circumstances constituting grounds for modification means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.

4. **Child Custody.** In determining the best interests of a child in a custody determination, a court must consider pertinent factors, such as the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child.

5. ____. Although not a completely determinative factor, the promotion and facilitation of a relationship by one parent with the other parent is a factor that may be considered when awarding custody.

6. **Child Custody: Intent.** A parent's intentional refusal to promote and facilitate the other parent's involvement in a child's important educational, religious, and medical needs constitutes a significant factor to consider when making custody decisions.

7. **Child Custody.** The best interests considerations for determining custody and the best interests considerations for determining removal become intertwined when a change in custody necessarily includes the relocation of the child's primary residence to another state.

8. ____. In relocation cases, a parent must first satisfy the court that he or she has a legitimate reason for leaving the state.

9. **Child Custody: Proof: Visitation.** Once the threshold burden of showing a legitimate reason for leaving the state has been met, the court then determines whether removal to another jurisdiction is in a child's best interests, which in turn depends on (1) each parent's motives for seeking or opposing the move, (2) the potential the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Affirmed.

Adam R. Little, of Ballew Hazen, P.C., L.L.O., for appellant.

Eddy M. Rodell for appellee.

Bishop, Arterburn, and Welch, Judges.

Bishop, Judge.

## I. INTRODUCTION

Alexandra Schlegel (Alexandra) appeals from the order of the Lancaster County District Court which modified a prior custody determination by awarding custody of the parties' son to his father, Dwayne Burton, who lives in Utah. We affirm.

## II. BACKGROUND

### 1. Original Paternity
### Action and Appeal

This case was previously before us on an appeal from an original paternity action. See *Burton v. Schlegel*, No. A-15-761, 2016 WL 3083232 (Neb. App. May 24, 2016) (selected for posting to court website). As established in that case, Alexandra and Dwayne are the parents of E.B., born in 2013.

At an unspecified time prior to E.B.'s birth, Alexandra and Dwayne began a relationship while Dwayne was living in Utah and Alexandra was living in Wyoming. Alexandra became pregnant with E.B., and the parties decided that Alexandra, and her three children from previous relationships, would move to Utah to live with Dwayne. During Alexandra's pregnancy, either Dwayne accepted a job offer in New Mexico, or his job was transferred there, and Alexandra and her children moved with him. Alexandra gave birth to E.B. in New Mexico at the end of 2013. Shortly thereafter, Alexandra and Dwayne's relationship ended. In February 2014, Alexandra moved with E.B. and her other children to Lincoln, Nebraska, to live with her sister. Also in February, Dwayne returned to Utah, where he subsequently married another woman, with whom he had previously had a daughter out of wedlock.

In June 2014, Dwayne filed a complaint in the Lancaster County District Court to establish paternity and custody of E.B. A bench trial was held in May 2015. In July, the court entered a written order in which it determined that Dwayne was E.B.'s biological father and granted Alexandra and Dwayne joint legal custody, but Alexandra had the final say in the event of an impasse. The court granted Alexandra physical custody, but concluded it was necessary to "set a firm schedule for the parties to rely upon" given the "history between the parties." Specifically, the court stated it was "not confident that [Alexandra] would be accommodating,

flexible and liberal in allowing [Dwayne] parenting time," but that it hoped her attitude "will moderate after the parties can settle into a routine with the child. There is a significant distance between them and their communication has not been desirable as far as the minor child goes." The court awarded Dwayne parenting time for the months of February, May, and August each year, plus November in even-numbered years and December in odd-numbered years. The court adopted a parenting plan, consistent with its order, which further provided that "[t]he parties shall be flexible in coordinating the commencement and conclusion of [Dwayne's] parenting time due to [his] work schedule, and the travel requirements," and "[b]oth parents acknowledge the responsibility to exercise and provide visitation and that time is of the essence in exercising and providing visitation." Each parent was directed to "provide the other parent with information and cooperation related to educational achievements and deficiencies of the child." The names of both parents were to appear on all medical and school records, and each parent was required to assist the other parent in obtaining access to such records if requested.

The district court also noted that the parenting time schedule "may not work once the child is of school-age." The court indicated: "When the child reaches the age of five, he becomes school-age which the Court deems a change in circumstances. At that time the parties may consider a change to the parenting plan adopted by this order." Dwayne was ordered to pay child support of $400 per month, a deviation of $235 below the guideline amount of support, based on Dwayne's travel expenses associated with parenting time. Each party was responsible for his or her own work-related childcare expenses.

Both parties raised issues on appeal, including Alexandra's claim that the district court erred in holding that "[E.B.'s] turning five years old would constitute a material change of circumstances not within the parties' anticipation." In May

2016, this court affirmed the judgment of the district court, and our mandate issued on June 28, 2016. See *Burton v. Schlegel*, No. A-15-761, 2016 WL 3083232 (Neb. App. May 24, 2016) (selected for posting to court website).

## 2. MODIFICATION ACTION

### (a) Pleadings

On January 9, 2019, Dwayne filed a complaint for modification. He alleged that since the entry of the order establishing paternity and custody in July 2015, there had been a material change in circumstances, including, but not limited to the following: The order only contemplated a parenting time schedule up until the time E.B. started kindergarten, and he was scheduled to start kindergarten in 2019. Alexandra failed to provide appropriate medical and/or dental care for E.B. Alexandra denied any reasonable request by Dwayne to accommodate minor changes to the parenting time schedule to travel. Alexandra refused to pay her share of E.B.'s medical bills. Alexandra's oldest daughter had been removed from Alexandra's home and was deemed uncontrollable. Alexandra did not notify Dwayne of medical appointments or medical emergencies regarding E.B. Despite being awarded joint legal custody, Alexandra unilaterally made decisions on behalf of E.B. without consulting Dwayne. Alexandra refused to speak to Dwayne about E.B. and told Dwayne that he needed to have his attorney contact her attorney. In his complaint, Dwayne sought full custody of E.B., subject to Alexandra's rights of parenting time. Dwayne also sought permission to remove E.B. from Nebraska to Utah, where Dwayne lived, and he sought an award of child support.

In her answer and "[c]ounter-[c]omplaint," Alexandra denied there had been a material change in circumstances as alleged by Dwayne. However, she alleged there had been a material change in circumstances requiring that the parenting plan be modified, as E.B. was to begin kindergarten in the fall of 2019. She asked the district court to modify the

parenting plan and child support order and to award her attorney fees and costs.

### (b) Modification Hearing

The modification hearing was held in October 2019. Several witnesses testified, and numerous exhibits, including text message and email exchanges between the parties, were received into evidence. A summary of the evidence follows.

Dwayne exercised all of his allotted parenting time. The current parenting time schedule would no longer work because E.B. started kindergarten in the 2019-20 school year. The lack of a workable parenting schedule was the main reason why Dwayne filed his complaint for modification. However, Dwayne alleged other reasons why a modification of custody was necessary.

In his complaint, Dwayne alleged that Alexandra failed to provide appropriate medical and/or dental care for E.B. Dwayne testified that E.B. had an "intussusception," where his intestines were "basically telescoping inside themselves and essentially digesting himself." Dwayne said that E.B.'s "large intestine was within a half an inch of being excreted through his colon"; it was discovered when E.B. was with Dwayne in Utah, and Dwayne confirmed that it was happening prior to the original trial starting in 2015. But Dwayne testified that other health issues had come up since the last order.

In early 2018, they learned that E.B. had been born with a previously undiagnosed heart murmur. The heart murmur was discovered when Dwayne took E.B. to a medical clinic for an infection in his mouth. When E.B. arrived in Utah, he complained about some soreness and swelling in his mouth. When Dwayne looked in E.B.'s mouth, he noticed that a bump on E.B.'s upper gums was swelling and decided to schedule an appointment to get it examined. It turned out that E.B. had been in an accident in Nebraska, where "he had knocked some of his front teeth" and the teeth ended up dying, becoming infected, and needing to be pulled. Dwayne communicated with Alexandra before and after taking E.B. to get his

mouth examined, and he also informed her about the discovery of the heart murmur. E.B. was seen by a cardiologist in Utah to determine the severity of his heart murmur. Dwayne informed Alexandra that E.B. would need to have further evaluations before being allowed to play sports and that there were certain sports that he may not ever be able to play. Dwayne testified that Alexandra refused to reimburse him for her half of E.B.'s cardiologist bill. In the email exchange received into evidence, Alexandra's reason for not paying her portion of the bill was that Dwayne took E.B. to an out-of-network provider; she thought E.B. could have waited to be examined by an in-network provider when he returned to Nebraska a few days later. However, at the modification hearing, Alexandra testified that she did not know at the time of her email in 2018 that the bill had already been submitted to Medicaid in Nebraska in addition to Dwayne's insurance company; she agreed that if she is able to speak with Dwayne and resolve what needs to happen with Medicaid, she would be willing to pay her portion of the bill.

Dwayne testified that in early 2019, he had a conversation with Alexandra about whether or not E.B. was caught up on all of the necessary immunizations for school and she said everything was current. However, after subsequently reviewing E.B.'s medical records with his Utah pediatrician, Dwayne learned that E.B.'s immunizations were not current. E.B. got his immunizations at a scheduled appointment with his Utah pediatrician, which Dwayne informed Alexandra of via text prior to the appointment. During a subsequent text exchange later that day, Alexandra told Dwayne she had intended to have E.B. get his immunizations at his kindergarten physical later that year. During that text exchange, Dwayne also posed medical questions to Alexandra as to (1) whether Alexandra sought medical clearance of E.B.'s heart murmur before signing him up for soccer, (2) when E.B.'s ears were last checked, and (3) where E.B.'s ear doctor was located. Rather than answering Dwayne's questions, Alexandra told him to contact

her attorney. Dwayne testified that he would not have objected to E.B. playing soccer if E.B. had proper medical clearance. According to Dwayne, after interrogatories were sent to Alexandra as part of the discovery process in this case, E.B. received medical clearance to play soccer.

In his complaint, Dwayne also alleged that Alexandra did not notify Dwayne of medical appointments or medical emergencies regarding E.B. Dwayne testified that on one occasion, E.B. was taken to an urgent care clinic and Alexandra did not notify him. Dwayne learned about the visit when he received an insurance statement. And Dwayne eventually learned that E.B. had another infection in his teeth from the accident described previously. In the November 2018 text exchange received into evidence, when Dwayne confronted Alexandra about the need to inform him about the urgent care clinic visit, she said that she had informed him E.B. needed antibiotics and that because it was a Sunday, Dwayne should have been able to use "deductive reasoning" because doctors' offices are not open on Sundays.

Alexandra testified that she was not included as a contact person on E.B.'s paperwork at various medical providers in Utah. The paperwork was filled out by the woman who is now Dwayne's wife (although she was not his wife at the time of the paperwork). Dwayne does not dispute that Alexandra was not included on the paperwork, and he claims in part that Alexandra failed to provide him with the necessary information, such as her date of birth, but he believed he informed her of all appointments.

In his complaint, Dwayne alleged that Alexandra denied reasonable requests to accommodate minor changes to the parenting time schedule for travel. Pursuant to the original parenting plan, Dwayne's standard parenting time was during the months of February, May, and August every year, plus November in even-numbered years and December in odd-numbered years. The parties were to be flexible in coordinating the commencement and conclusion of Dwayne's parenting time to

accommodate his work schedule and travel requirements. Parenting time exchanges were to occur on the weekends closest to the first and last days of the months, and Dwayne could pick E.B. up as early as Friday and return the child as late as Sunday to accommodate the best travel fares. Dwayne's parenting time was never to be shorter than the number of days in the given month that he was exercising his parenting time. And he was to notify Alexandra no less than 1 week prior as to the date and time he would pick up and return E.B. Unless otherwise agreed upon, Dwayne was to pick E.B. up from Alexandra at the commencement of his parenting time and return him to her at the conclusion of his parenting time. However, to the extent that Dwayne returned with E.B. to the Lincoln or Omaha airport in Nebraska, Alexandra was to pick E.B. up at the airport.

Various text messages showing disagreements over parenting time exchanges were received into evidence. Dwayne testified that he had issues coordinating "pick-ups and drop-offs . . . [j]ust about every time." When asked what kind of issues he had, Dwayne responded, "What days [Alexandra] would prefer for me to pick up and drop off versus what days I've notified her are going to work best for me. Locations of pick-up and drop-offs, times of pick-up and drop-offs. Everything." Dwayne said he drove the 26-hour round trip for parenting time exchanges "most of the time." And more problems seemed to occur when he flew to get E.B. for parenting time. Because of his work and home schedules, Dwayne was only able to make travel arrangements about 1 or 2 weeks in advance of a scheduled visit. If he was going to fly, he said that he would try to communicate with Alexandra and book his flight "at the same time as best as possible" and that he would "[t]ry to let her know" when he would be in Nebraska "based on the flight availability." When asked if Alexandra had any requirements about who had to be there when he picked E.B. up, Dwayne responded, "Yes," "she personally ha[d] to be [the] one to do the exchange with me." Alexandra only

allowed Dwayne to pick E.B. up from daycare if she could be there to personally oversee the transition. There were "multiple times" when Alexandra would not allow a pickup from daycare because she could not be there.

In October 2018, Dwayne was trying to coordinate his November parenting time and asked Alexandra if he could pick E.B. up on October 28 in order to have him for Halloween, a holiday Dwayne had not shared with E.B. since he was 1 year old; Dwayne planned to return E.B. to Alexandra on Sunday, December 2. Alexandra said no to the additional few days and "told me if I had any problems with her decision, I would need to contact my lawyer."

In his complaint, Dwayne alleged that despite being awarded joint legal custody, Alexandra unilaterally made decisions on behalf of the minor child without consulting him. Dwayne testified that Alexandra enrolled E.B. in a Catholic school for kindergarten without the two of them having any discussions about what elementary school E.B. would attend. Alexandra testified that she assumed Dwayne was "okay" with her decision, because he did not respond to her text about E.B.'s enrollment in the school. Dwayne also testified that Alexandra informed him that she was having E.B. baptized in the Catholic Church. Dwayne objected to E.B.'s baptism into a faith that Alexandra herself was not baptized into. "I let her know that if she wanted to first, herself, you know, join a church and religion, that I would be open to the discussion of [E.B.] being baptized into the same religion." As evidenced by text messages received into evidence, Alexandra told Dwayne that she wanted to raise E.B. as a Catholic like her other children. When Dwayne asked her additional questions, he was ignored. Alexandra later sent Dwayne pictures of E.B.'s baptism. Dwayne believed that he and Alexandra should have had discussions prior to the baptism, but Alexandra told him to "refer to the Decree."

Alexandra and Dwayne usually communicated through text messages, but also communicated via email. Dwayne stated

he "tr[ied]" to communicate well with Alexandra, but he did not believe she did the same. Several text message threads received into evidence reveal that when Dwayne questioned Alexandra about medical bills, immunizations, et cetera, her response was that he should contact her attorney. There were also times when Dwayne posed medical questions regarding E.B., and she ignored him.

In his complaint, Dwayne alleged that Alexandra's oldest daughter had been removed from the home and was deemed uncontrollable. Dwayne testified that, according to court records, Alexandra's daughter was involved in a juvenile court case that resulted in her being removed from Alexandra's home, although Dwayne was aware that her daughter was back in the home as of the summer of 2019.

Alexandra testified that her oldest daughter, who was 18 years old at the time of the modification hearing, started having issues in the eighth grade. Alexandra decided to apply to the State to have her daughter deemed ungovernable so that Alexandra could get assistance for her. In April 2018, her daughter did not want to live with her anymore. Since her daughter was still on probation, Alexandra told the juvenile court judge that her daughter would not listen to her, so the daughter was removed from the home. She went to different facilities, and during a home visit that November, she "ran off" and "got picked up." She eventually completed the program, "came home for a couple weeks," and then moved out on her own to go to school full time and to work full time. According to Alexandra, her daughter's probation officer "is planning on letting her go on Halloween." Alexandra stated she and her daughter have a good relationship.

Dwayne believed that because Alexandra's daughter was deemed uncontrollable, this was "an indication of the things that are happening at [Alexandra's] house in Nebraska." He stated, "There's already a question of her parenting regarding the oldest child and the things that have been going on with that child." According to Dwayne, E.B. was also

experiencing behavioral problems. When asked if he feared that E.B. was "headed down that path as well," Dwayne responded, "Absolutely."

Dwayne first became aware of E.B.'s behavioral problems when he subpoenaed daycare records for these court proceedings. Dwayne said there were reports that indicated E.B. was

> being disruptive in school, waking up during nap times and running around the classrooms and in the hallways exposing his private parts to teachers, to other students, asking them to wake up and be naughty with him because being naughty is fun, and asking them all to join in with him in exposing themselves.

There were instances of E.B.'s physical aggression toward other students, as well as toward teachers and the faculty, and instances of his breaking and destroying property. There were also issues with him "cursing and using foul language while running through the schools as well as directed directly at some of the adults, teachers, child care providers, [and] administrators." Dwayne was concerned about these behavioral issues, none of which were reported to him by Alexandra. Dwayne also learned at depositions the week prior to the modification hearing that E.B. was having issues at his elementary school; Alexandra had mentioned "something along the lines of [E.B.] had a few issues in the beginning." Other than mentioning it at a deposition, Alexandra never told Dwayne about E.B.'s behavioral issues at his elementary school. Dwayne was concerned because "if [E.B. was] continuing to display behaviors of something of this sort, it is absolutely something that should be talked about and discussed with both parents." Alexandra acknowledged that she never informed Dwayne of the behavioral issues E.B. had at his daycares and elementary school.

Christen Million was a behavioral consultant and then the program director at E.B.'s first preschool in Lincoln. Million stated that most of E.B.'s behavior incident reports started happening when he was 3 or 4 years old, which is typical, and that a lot of his behaviors occurred around naptime. Million

indicated that during one incident in January 2019, E.B.'s regular teacher was gone for the day and E.B. and another child "became escalated and threw some things around the room and [were] just disruptive." E.B. threw water everywhere, flipped things over, threw things across the room, and ripped someone's hoodie; Alexandra was called to come pick him up for the day. That incident led to a behavior plan being put into place. According to Million, Alexandra was "very responsive" in meeting to create the plan and supporting it at home. Million had no concerns about Alexandra's parenting. E.B. left the preschool in April.

With regard to E.B.'s issues at preschool, Alexandra testified that "[i]t seemed like a very normal thing that he was doing," and there were things that E.B. was doing that they thought he was doing because he was bored or needed attention, but "it was never deemed a problem necessarily." However, he was put on a behavioral plan and Alexandra did not inform Dwayne of the plan. In April 2019, Alexandra switched E.B. to a different childcare center, because she thought "changing atmospheres would help" E.B. because there was less structure at the new center which was a "play-based" center. According to Alexandra, E.B. continued to have "some" issues during the months he was at the new center. Copies of the incident reports and a letter from the new center's founder were received into evidence. In his letter, the founder attributed E.B.'s calling a teacher and students a profane name to something E.B. picked up from another student, and he attributed two other behavioral incidents to typical and boundary testing behaviors.

As noted previously, E.B. was a kindergartener for the 2019-20 school year. Sister Janelle Buettner is the principal of E.B.'s elementary school in Lincoln. She said that Alexandra was honest in telling her that E.B. had behavioral problems at his previous daycare facilities, and Buettner let her know that the school staff would work with him and do what they could. According to Buettner, "[E.B.] had a rough week and a half" in her school at the beginning of the school year,

but "he has blossomed in the environment and done very well." Documentation from August 16 through September 13, 2019, and from September 24, was received into evidence and reveal E.B.'s behavior issues at school, including his refusing to cooperate or follow directions, hitting, kicking, name calling with profanity, and knocking things over; he had to be removed from the classroom multiple times. The school had to bring Alexandra in early on to see what was going on. Buettner and her assistant watched as Alexandra treated E.B. with "total dignity and love and respect" while talking to him about the situation. After Alexandra left, the staff discussed dealing with E.B. in a manner consistent with Alexandra's actions. There were more incidents, but as E.B. saw that the staff "w[as]n't going anywhere" and that they "loved him," his behaviors decreased. Buettner stated that at the beginning of the year E.B. was testing his limits, like most children do. But "what I see of [E.B.] now is a very carefree, loving, funny, smart little boy."

Dwayne testified that in Utah, E.B. never had writeups or outbursts similar to what he had in Lincoln. When asked if he had behavioral issues with E.B, Dwayne responded, "No." Only once "a couple years ago" did E.B become physically aggressive and hit a sibling during a disagreement. Alexandra testified that E.B. does not typically have behavioral problems at home.

In July 2019, Alexandra informed Dwayne that she was proceeding with her attorney's advice and taking E.B. to see Dr. Rick McNeese, a psychologist, to get an assessment of her and E.B. and that Dr. McNeese would like Dwayne to do the same. When asked if he participated in that evaluation, Dwayne responded that he did not. When asked why he did not participate, Dwayne responded:

> Some of the concerns [were] that it had not been pre-discussed or predetermined as a necessity through . . . my attorney. It also provided some difficulties in a situation where I lived out of state and the possibility of getting Dr. McNeese to fly out to Utah to do some visits and

stuff with myself and [E.B.] while he was in my care, it
just did not seem like a logical or reasonable option.
There was also no indication that the evaluation was medi-
cally necessary.

Dr. McNeese testified that he was retained by Alexandra
to conduct a psychological evaluation of her and a behavioral
evaluation of E.B. His report, which was received into evi-
dence, was titled "Psychological Evaluation With Regards to
Custody and Parenting" and was dated September 24, 2019.
Dr. McNeese utilized psychological testing of Alexandra,
questionnaires completed by Alexandra, diagnostic interviews
of Alexandra and E.B., observations of E.B. in the office and
in Alexandra's home, and a review of collateral informa-
tion from Buettner and Million. According to Dr. McNeese,
Alexandra was "pretty straight forward and open and honest
with things," and that was reflected in her "validity scales" in
the testing. E.B. had some challenging behaviors, "some ele-
ments of attention kinds of issues," "some elements of oppo-
sitional behavior," "[e]ven some elements of conduct prob-
lems that are more significant." Dr. McNeese stated that E.B.
"didn't really fall into any diagnostic criteria at that point, but
it was pretty obvious that he had more, what we call, exter-
nalizing behaviors or acting-out behaviors." Dr. McNeese's
"conceptualization at this point is that [E.B.] is undergoing,
obviously, a number of stressors in the family and changes"
like adapting to a different school and environment, but "some
behavior problems . . . have been there for a while." From Dr.
McNeese's review of collateral information, it did appear that
in the past month, E.B.'s behavior was "much more manage-
able and we're seeing more positive behavior from him." Dr.
McNeese would suggest an "ADHD" evaluation at "some
point down the line."

Dr. McNeese acknowledged that much of the reporting came
from Alexandra and collateral contacts in Nebraska. He did pro-
vide Dwayne a parental questionnaire and a copy of the finan-
cial and assessment agreement that parents sign disclosing

costs and procedures, but he did not hear back from him. Dr. McNeese stated that it would have been helpful for him to have the parental questionnaire, because it would have given him "a start on kind of seeing what he was seeing in another environment."

In his testimony and in his report, Dr. McNeese concluded: Dwayne showed a "modest interest" in more active participation in the evaluation and assistance with decisionmaking; a major household change would place the child at risk of developing further problem behaviors; according to the collateral information, Dwayne had largely been uninvolved in E.B.'s childcare and school performance in Lincoln, whereas Alexandra had been actively involved in supporting E.B.'s teachers and doing what she could to assist in his behavior management plans; there was a risk that Dwayne's lack of involvement in E.B.'s school performance and activities would potentially lead to further distancing or withdrawing from the relationship with E.B., and it was in E.B.'s best interests for Dwayne to be involved and for E.B. to continue to have access to Dwayne; E.B. was at a developmental stage where he needed a sense of order and predictability; another developmental concern for children as young as E.B. was that being away from a mother who was the primary parent was difficult for that child; and there were suggestions of potential "ADHD" which bears watching in the next couple of years. Dr. McNeese recommended having E.B. remain with Alexandra during the school year and having 4 to 6 weeks of parenting time with Dwayne each summer. He also recommended that E.B. have communication with the parent he is not having parenting time with at least three times weekly by phone, "FaceTime/Skype," or other technological means.

On cross-examination, Dr. McNeese was asked if he would be surprised to learn that for the last several years, the parents had been doing video conferences with E.B. at least twice a week no matter who E.B. was with. Dr. McNeese responded, "I guess, honestly, I would be some [sic] surprised because

I didn't get the feel for there being much communication between the two of them." And when asked if he would be surprised to learn that Alexandra did not report any of E.B.'s behavioral problems to Dwayne, Dr. McNeese responded, "Again, . . . I have operated under the impression that . . . there wasn't much communication," "[s]o I don't know that I would be surprised."

According to Dwayne, in August 2019, Alexandra informed him that she was getting a counselor for E.B. Dwayne did not object and felt that it was appropriate given the behavior problems Dwayne learned E.B. was having.

Dwayne believed he could provide a safe and suitable environment for E.B. in Utah. Dwayne acknowledged that when he was married to his ex-wife (the mother of his oldest child), he left E.B. with her and then later found her under the influence of alcohol while she was caring for him. He also acknowledged that he and his ex-wife had physical confrontations while E.B. was present. Dwayne divorced his ex-wife because of the issues they had "with her alcoholism" and the physical altercations.

Dwayne lives in Utah with his current wife, Megan Burton; they lived together for approximately 2 years and were married in the spring of 2019. Between the two of them, they have six children. Dwayne has custody of his 9-year-old daughter from a previous relationship, and he has E.B. Megan has three children (ages 14, 12, and 9 at the time of the hearing) from a previous marriage; those three children live with Dwayne and Megan 50 percent of the time, on an every-other-week schedule. And Dwayne and Megan have a 1-year-old daughter. Dwayne and Megan's home has five bedrooms. E.B. shares a bedroom with his stepbrother.

On a typical day when E.B. is at Dwayne's house, Dwayne is "up and out the door" before the children wake up for school. Megan gets the children up, ready, and off to school; she also picks them up after school. Dwayne gets home between 2 and 5 p.m., at which point, he and Megan share

responsibilities. According to Dwayne, E.B. and Megan have a "very, very open," "[v]ery loving, very affectionate" relationship. E.B. and Dwayne's older child are "best friends" and spend the most time together. E.B. also likes playing with his stepsiblings, especially his stepbrother. Additionally, E.B. has some neighbor friends in Utah. Dwayne's parents and two of Dwayne's seven siblings live within a 30-minute drive of Dwayne's house, and E.B. has a good relationship with Dwayne's extended family. E.B. also has a good relationship with Megan's extended family that lives within 20 minutes of them. In Utah, E.B. would attend the same school that his older half sister and two of his stepsiblings attend.

In Dwayne's proposed parenting plan, he would be awarded physical custody of E.B. and Alexandra would receive parenting time every summer commencing the first Saturday in June and concluding the first Saturday in August; every spring break; in even-numbered years, Thanksgiving break as well as Christmas break beginning on December 27; and in odd-numbered years, the entire Christmas break. Dwayne would also bear the burden of E.B.'s transportation costs. In the event that Alexandra was awarded custody, Dwayne asked for the same parenting time schedule to apply, but that he receive a deviation in his child support obligation for travel costs.

Dwayne believed his relationship with Alexandra would get better if he was granted permission to move E.B. to Utah because a lot of the arguments and disagreements they have stem from a lack of communication from Alexandra, as well as disagreements and arguments about transportation arrangements. Dwayne thought a change in custody "would definitely alleviate a vast majority of those situations." On cross-examination, Dwayne stated that he is "not innocent" regarding the hostilities between the parties. He also acknowledged that in 2015, after trial, but prior to the entry of the order in the original paternity action, he sent an email to Alexandra calling her a "white trash baby maker" and stating that her children would rather commit suicide than live with her.

Alexandra believes that she can care for E.B. appropriately. Alexandra lives in Lincoln with her "partner," Brent Cushman (Brent). Between the two of them, they have eight children, seven of whom live at home. Alexandra has three teenage children from previous relationships; one of those children, her daughter, lives on her own. Alexandra also has E.B. Brent has two teenage children from a previous relationship. And Alexandra and Brent have two younger children together. Alexandra and Brent's home has five bedrooms. E.B. used to share a room with an older half brother, but had his own room at the time of the modification hearing. Either Alexandra or Brent drop E.B. off at school. After school, E.B. goes to extended daycare for approximately 2 hours, before he goes home for the evening. If Alexandra needs someone to provide care for the children, it is either Brent or her mother.

Alexandra believed it was in E.B.'s best interests to remain in her custody. She had always been E.B.'s primary caregiver and put his needs first. Alexandra was concerned that when E.B. was in Dwayne's care, Dwayne was not E.B.'s primary caregiver—Dwayne's significant others were. Alexandra stated that E.B. had trouble with change and that transitions were difficult for him. She said "we are finally at a good place, as he feels safe and loved and trusts where he's at. And to take that away from him would be very damaging."

In Alexandra's proposed parenting plan, the parties would maintain joint legal custody of E.B. and she would maintain physical custody. She proposed that Dwayne have parenting time 6 weeks every summer, every fall break, every Thanksgiving break, half of Christmas break, and every Easter/spring break.

Alexandra believes that she and Dwayne can successfully coparent. With regard to communication between the two of them, Alexandra stated:

> It is little to none if either of us can help it. . . . The more we talk, the more toxic we are to each other. And it just doesn't go well for us. And so I assume he's doing his

> best. I assume he believes I'm doing my best. And we
> just go from there.

Alexandra agreed that many of their issues surround "pick-up
and drop-off."

### (c) District Court's Order

In its order entered on December 20, 2019, the district
court engaged in the removal analysis set forth in *Farnsworth
v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). After
completing its removal analysis, the court found that "when
viewed considering all of the circumstances, there is a change
in circumstances and that a change in the custody is in the best
interests of the minor child." The court sustained Dwayne's
complaint to modify and denied Alexandra's "[c]ounter-
[c]omplaint." The parenting plan adopted by the court and
attached to the court's order awarded the parties joint legal
custody of E.B., with physical custody awarded to Dwayne
beginning January 3, 2020. Alexandra was awarded regular
summer parenting time to commence on the seventh day fol-
lowing the release of the child for the summer recess and con-
cluding 7 days before school commences in the fall. She was
awarded regular school year parenting time during E.B.'s fall
and spring breaks every year. A Thanksgiving and Christmas
break parenting time schedule was also established, and it
included that Alexandra have extended Christmas break par-
enting time in odd-numbered years. Dwayne is to provide
Alexandra additional parenting time if she has the opportunity
to exercise parenting time in Utah. Further, the parties are
to work in good faith to allow Alexandra to have additional
parenting time as schedules and circumstances allow. Unless
otherwise agreed upon between the parties, Dwayne is to pro-
vide transportation for E.B. between Utah and Nebraska twice
per year; Alexandra is to be responsible for all other trans-
portation. The court ordered Alexandra to pay child support
in the amount of $50 per month beginning January 1, 2020;
this is a downward deviation from the child support guidelines

because of the transportation costs she will incur to exercise her parenting time. Each party was ordered to pay their own costs and attorney fees.

Alexandra appeals.

## III. ASSIGNMENTS OF ERROR

Alexandra assigns, restated, that the district court erred by (1) failing to find that Dwayne did not meet his burden of establishing a material change in circumstances which was not contemplated by the parties at the time of the original order, (2) improperly applying the removal analysis to a noncustodial parent without first determining that a change in custody was in the child's best interests, (3) failing to find a legitimate reason to leave the state with the minor child, and (4) permitting removal of the child against his best interests.

## IV. STANDARD OF REVIEW

[1] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

## V. ANALYSIS

### 1. APPLICABLE THREE-STEP ANALYSIS

The most factually similar case we can find to the present case is *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013), a custody modification case wherein a noncustodial parent sought custody of his two children and permission to move the children from Nebraska to Wyoming where he lived. In that case, the district court entered a detailed order granting the father's request to modify the original custody arrangement such that he was awarded primary physical custody of the children. The court conducted a three-part analysis: It first considered whether there had been a material change of circumstances since the original custody agreement, it next considered whether the

best interests of the children required modification of custody, and it then considered whether relocation of the children from Nebraska to Wyoming should be ordered.

[2] On appeal, this court concluded that in the case of a noncustodial parent seeking a modification of custody and removal from the jurisdiction, the approach utilized by the district court was appropriate. This court then held:

[I]n cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. If this burden is met, then the court must make a determination of whether removal from the jurisdiction is appropriate.

*State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. at 419, 838 N.W.2d at 360.

As noted by Alexandra, the district court in the present case did not follow the applicable three-step analysis as set forth in *State on behalf of Savannah E. & Catilyn E. v. Kyle E., supra*. She contends that "[w]here a noncustodial parent simultaneously seeks modification of custody and removal, the appropriate procedure is to *first* consider whether a modification of custody is appropriate and *then* to consider whether removal is appropriate." Brief for appellant at 22 (emphasis in original). While Alexandra agrees that a "traditional best interests analysis" and a removal best interests analysis "are necessarily intertwined," she nevertheless contends that the traditional best interests analysis must be performed first before reaching a removal analysis. *Id*. Dwayne also acknowledges that the court "did not first perform a separate custody analysis before addressing" the removal factors, but he argues that the "best interests analysis is intertwined with a removal analysis." Brief for appellee at 21. He points out that the court's order "goes into great detail" on each of the removal factors and that "[s]uch an analysis goes hand in hand with an analysis for modification of custody." *Id*.

Both parties make good points. While we agree with Alexandra that the district court did not strictly follow the three-step analysis set forth in *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013), we also agree with Dwayne that the district court in essence intertwined a traditional best interests analysis with a removal best interests analysis. In its order, the court appears to have combined the three-step analysis into one blended analysis by first setting forth the evidence under removal factors, which are designed to consider a child's best interests, in order to set forth the court's reasoning for finding a material change in circumstances and its decision to modify physical custody. While the court's blended analysis is not the preferred three-step analysis set forth in *State on behalf of Savannah E. & Catilyn E. v. Kyle E., supra*, we cannot say the blended analysis in and of itself constitutes an abuse of discretion warranting reversal. Rather, in our de novo review, we will apply the three-step analysis to the evidence in the record to determine whether the district court abused its discretion when it granted custody to Dwayne and allowed him to remove E.B. to Utah.

## 2. Material Change
### in Circumstances

[3] In cases involving the modification of child custody, a material change of circumstances constituting grounds for modification means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. See *Fichtl v. Fichtl*, 28 Neb. App. 380, 944 N.W.2d 516 (2020).

We previously indicated in the prior case that it was not an abuse of discretion for the district court to reserve ruling on what parenting plan would be in E.B.'s best interests by the time he reached school age. *Burton v. Schlegel*, No. A-15-761, 2016 WL 3083232 (Neb. App. May 24, 2016) (selected for posting to court website). We noted that given the history

of frequent and significant changes in the parties' lives at that time, it was reasonable for the trial court to suspect that their circumstances would be different by the time E.B. started school. We concluded that the court did not act unreasonably in declining to predict what would be in E.B.'s best interests when he reached school age. Here, the fact that E.B. was starting kindergarten constituted a material change of circumstances that, at a minimum, warranted a modification of parenting time. Alexandra acknowledges that modification to the parenting time schedule was warranted; however, she argues that Dwayne failed to prove that custody should be modified. She contends that at the time of the original decree, the court "was clearly aware of the parties' acrimonious relationship, yet still awarded custody to [Alexandra]." Brief for appellant at 21. She claims, "The court set her up to fail from the start, [which] cannot be the basis for a change of circumstances." *Id*.

However, based on our review of the record, besides the known existence of the parties' acrimonious relationship at the time of the original decree, there were subsequently other material changes for the district court to consider related to modifying physical custody. Although, as the district court noted, Dwayne was not without fault in "the communication area" and "instigated conflict where another path might have been available," the "weightiest" concern was that Alexandra had "simply taken positions inconsistent with the responsibilities inherent as primary parent as to cooperation and communication." Notably, the court stated:

> With regard to the best interests of the child, it is the willingness of the custodial parent to be open, informative and cooperative that serves the best interests of the minor child. . . . If a parent does not promptly inform and consult with the other party, the best interests of the minor child are not served. . . .
>
> In this case, it does not appear that [Alexandra] has or will take the necessary steps to be cooperative and

informative. While she expresses a [newfound] under-
standing of her obligations, her credibility is lacking.
Distance is difficult enough, but when the noncustodial
parent is not advised of medical, religious, social and
educational progress and needs, the difficulties created
by distance are exacerbated. The evidence very clearly
weighs in favor of [Dwayne] when evaluating which
party would be most cooperative with the other.

The record before us reveals that since the time of the origi-
nal decree, Alexandra did not exhibit flexibility and coopera-
tion with parenting time exchanges, she withheld information
regarding E.B.'s behavioral issues, she made unilateral deci-
sions regarding E.B. without engaging in meaningful discus-
sion with Dwayne and otherwise took advantage of the "final
say" authority granted to her, and she repeatedly refused to
converse with Dwayne or ignored his legitimate questions and
instead told him to contact her lawyer. The behaviors between
the parties, and most notably Alexandra, constitute a material
change of circumstances affecting E.B.'s best interests, which
had it been known to the trial court at the time of the initial
decree, would have persuaded the court to decree differently.
Although at the time of the initial decree the court noted its
lack of confidence in Alexandra's ability to be flexible and
accommodating, the court "hope[d] this attitude [would] mod-
erate after the parties [could] settle into a routine with the
child." The court's hope did not come to fruition. Accordingly,
we cannot say that the district court abused its discretion in
finding there was a material change in circumstances affecting
the best interests of the minor child.

## 3. Best Interests

The next inquiry is whether the best interests of the child
compel a change of custody.

[4] Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides
that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018).

Based upon our de novo review of the record, we cannot say that the district court abused its discretion by concluding that it was in E.B.'s best interests to have his physical custody awarded to Dwayne. We previously set forth the court's explanation regarding E.B.'s best interests and its concerns about leaving physical custody with Alexandra. We acknowledge that E.B. has a loving relationship with both of his parents. Both parents provide for E.B. while in their care. And there is no evidence of abuse in either household. However, as stated above, Alexandra has exhibited an attitude of uncooperativeness with Dwayne, particularly as it relates to parenting time exchanges and to informing him of E.B.'s behavioral and medical issues.

Alexandra's lack of cooperation in facilitating parenting time between Dwayne and E.B. is concerning; such behavior demonstrates a disregard for the importance of the relationship between them. The district court stated that Alexandra "has failed and refused to be 'accommodating, flexible and liberal'" related to parenting time. The court found that

> maintaining the status quo would embolden her in ways that would not be in the child's best interests. During recent communications, [Alexandra] simply responded that [Dwayne] should just call his attorney. That is certainly not the sort of thing the Court would have expected in this case, especially during the pendency of the action.

The fact that one parent might interfere with the other's relationship with the child is a factor the trial court may consider in granting custody, but it is not a determinative factor. *Kashyap v. Kashyap, supra*. We therefore also look at the other evidence related to E.B.'s best interests which was considered by the court in reaching its decision to modify physical custody.

[5,6] The court stated, "Importantly, [Alexandra] has failed to disclose significant issues relating to the minor child and has not involved [Dwayne] in matters that might be material and important in the life of the minor child such as worrisome behaviors during school [and] making changes without [Dwayne's] input." Although not a completely determinative factor, the promotion and facilitation of a relationship by one parent with the other parent is a factor that may be considered when awarding custody. See *Kashyap v. Kashyap, supra*. It stands to reason that a parent's intentional refusal to promote and facilitate the other parent's involvement in a child's important educational, religious, and medical needs constitutes a significant factor to consider when making custody decisions.

The court also concluded that E.B. has fit in well with Dwayne, his family, and his environment during the extended parenting times. The court stated that Dwayne "offers a bit

more structure in the home environment which would benefit [E.B.]" On the other hand, the court noted that Alexandra's "household was loving but hectic." The court summarized, "For reasons that are very difficult to articulate it appears that the home environment of [Dwayne] might offer more structure and accountability to [E.B.]" Given the evidence related to E.B.'s behavioral concerns, the district court's finding related to Dwayne's ability to offer more structure to E.B. is an important consideration in our review, as is its determination that Dwayne and his wife would better provide for E.B.'s medical and mental health needs.

Based on the record before us, we cannot say that the district court abused its discretion in finding that a material change in circumstances had occurred since the original decree such that it was in E.B.'s best interests to change his physical custody from Alexandra to Dwayne. We are mindful of the fact that the trial judge heard and observed the witnesses and was in a better position to determine the credibility of the parties. Notably, the court specifically found "credibility is lacking" regarding Alexandra's newfound understanding of her obligations as a custodial parent.

[7] Having determined the district court did not abuse its discretion in modifying physical custody, we now consider Dwayne's request to remove E.B. to Utah. In custody modification cases that do not involve removal of a child to another state, the best interests considerations we discussed above would conclude our analysis. However, where a change in physical custody will also require relocating the child to another state, additional factors must be considered to determine whether the change in custody is still in the child's best interests. Thus, the best interests considerations for determining custody and the best interests considerations for determining removal become intertwined when a change in custody necessarily includes the relocation of the child's primary residence to another state. See, e.g., *Clinton M. v. Paula M.*, 21 Neb. App. 856, 844 N.W.2d 814 (2014) (in circumstances where

parents share joint legal and physical custody, parent seeking modification must first prove material change in circumstances affecting best interests of child by evidence of legitimate reason to leave state, together with expressed intention to do so; once parent seeking modification has met threshold burden, separate analyses of whether custody should be modified and removal should be permitted become intertwined). See, also, *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000). We now consider E.B.'s best interests in the context of his relocation to Utah.

### 4. Removal From Jurisdiction

#### (a) Legitimate Reason to Leave State

[8] In relocation cases, a parent must first satisfy the court that he or she has a legitimate reason for leaving the state. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). Like in *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013), this case differs from the typical removal case because Dwayne, the noncustodial parent, was seeking to gain physical custody of E.B., which necessarily would require moving him to Utah. Further, Dwayne is not leaving the state, but, rather, he has resided in Utah for several years and is seeking permission to relocate E.B. there. See *id*. Accordingly, Dwayne demonstrated a legitimate reason to relocate E.B.

#### (b) Best Interests of Child

[9] Once the threshold burden of showing a legitimate reason for leaving the state has been met, the court then determines whether removal to another jurisdiction is in a child's best interests, which in turn depends on (1) each parent's motives for seeking or opposing the move, (2) the potential the move holds for enhancing the quality of life for the child and the custodial parent, and (3) the impact such a move will have on contact between the child and the noncustodial

parent, when viewed in the light of reasonable visitation arrangements. *State on behalf of Savannah E. & Catilyn E. v. Kyle E., supra*.

### (i) Each Parent's Motives

The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002).

Although Alexandra claims that Dwayne's only stated motive was a reduction in his child support, her claim is simply not supported by the record. We have previously set forth the many reasons why Dwayne sought a modification of custody.

We agree with the district court's findings that the evidence presented showed both parties care about E.B.'s well-being and that there were legitimate reasons for seeking and opposing E.B.'s move as both parties are "fully enmeshed" in their respective home states. There is no evidence that either parent's motive in requesting or opposing removal was adverse to E.B.'s best interests.

### (ii) Quality of Life

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the child, we have previously considered several pertinent factors, including: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the

best interests of the child are interwoven with the well-being of the custodial parent. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). This list should not be misconstrued as setting out a hierarchy of factors. *Kashyap v. Kashyap, supra*. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*.

Alexandra argues that the district court failed to properly weigh several of those factors. While we will conduct our own review of the factors, we find it unnecessary to specifically weigh each factor, since our purpose in this particular analysis is to consider the evidence in terms of whether any factor(s) would so strongly overcome the determination already made that it is in E.B's best interests to be placed into Dwayne's physical custody. In other words, we will consider the evidence in the context of whether a factor weighs against E.B.'s best interests by being removed from Nebraska to be in his father's physical custody in Utah.

### a. Emotional, Physical, and Developmental Needs of E.B.

The district court found the evidence reflected that E.B. had been having rather significant difficulties at school and behavior issues. Alexandra consistently failed to disclose those issues to Dwayne or communicate with him as to the needed plans for dealing with those issues. While Alexandra adequately provided for the minor child in terms of food, shelter, and nurture, there was some dispute as to whether the medical and dental care had been sufficient.

Dr. McNeese recognized that E.B.'s behavioral problems were of concern and suggested an "ADHD" evaluation at some point in the future. Dr. McNeese was concerned about E.B.'s ability to adapt to change and suggested a move would be detrimental to him. And Dr. McNeese favored a parenting plan similar to that proposed by Alexandra.

Alexandra argues the district court should have given more weight to Dr. McNeese's opinions. However, the district court was concerned that Dr. McNeese did not seem to have a background of the history between the parties and the actions of each since the last order was entered. The court indicated it had considered Dr. McNeese's concerns about E.B.'s "adaptability to change and the issues caused by new environments," and that a move would be detrimental to him. The court said it had "considered those factors and trusts those opinions." Nevertheless, the court concluded that E.B. was young and that

> the surroundings, people and circumstances of [Dwayne's] environment are very well known to [E.B.] The difference really is starting a new school in the middle of a term. The court finds that [Dwayne] is aware of those concerns and willing and able, with his family, to navigate any issues related in going to a new school.

The district court observed that Dr. McNeese did not have information about Dwayne or the nature of the circumstances that were available to E.B. if he moved to Utah. We acknowledge that it was Dwayne's choice not to participate in the evaluation, but we also acknowledge his reasons for not participating, namely that the necessity of an expert was not previously discussed with him, the expert was chosen and hired by Alexandra, and the distance presented a problem.

Dwayne is not a stranger to E.B. Until the 2019-20 school year, E.B. spent 4 months every year in Utah, seemingly without incident. It appears that both Alexandra and Dwayne would be able to provide for the emotional, physical, and developmental needs of E.B. However, the district court found that Dwayne and his wife might have a better handle on E.B.'s medical and mental health needs if he was in Dwayne's care. We are mindful of the fact that the trial judge heard and observed the witnesses and was in a better position to determine the credibility of the parties. No evidence under this factor weighs against E.B.'s removal from Nebraska to be in his father's physical custody in Utah.

### b. E.B.'s Opinion or Preference

This factor is not applicable here because E.B. did not testify at trial.

### c. Enhancement of Income or Employment

The district court found that this factor is neutral because there was no evidence that income or employment is an issue. We find that in a situation like this, where both parties continue to work in their home states, this factor is neutral or inapplicable.

### d. Housing or Living Conditions

Each party has a five-bedroom home that is shared by two adults and six or seven children. E.B. shares a bedroom when he is at Dwayne's home and has recently stopped sharing a bedroom at Alexandra's home. There was no evidence that either home was inappropriate.

The district court found that "[f]or reasons that are very difficult to articulate it appears that the home environment of [Dwayne] might offer more structure and accountability to [E.B.]" No evidence under this factor weighs against E.B.'s removal from Nebraska to be in his father's physical custody in Utah.

### e. Educational Advantages

As noted by the district court, it appears that the educational needs of E.B. are being met. It does not appear from our record that there would be any educational advantages in Utah as opposed to Nebraska. E.B. appears to struggle somewhat with transition. By all accounts, E.B. had a rough start in kindergarten, although some of those behaviors were present earlier when he was in daycare. However, Buettner, the principal at E.B.'s elementary school, stated that E.B.'s behaviors improved as time went on. Although this evidence might lean toward keeping E.B. in the same school environment, it does not by itself outweigh the other factors supporting E.B.'s

removal from Nebraska to be in his father's physical custody in Utah.

### f. Relationship Between
### E.B. and Each Parent

Until the 2019-20 school year started, E.B. was spending 4 months each year with Dwayne in Utah. As evidenced by the record, E.B. has a good relationship with both of his parents. And, as noted by the district court, neither party suggested, in any way, that the other parent was lacking in his/her relationship with the minor child. The district court found that the bond between Alexandra and E.B. was strong, and it ultimately found this factor disfavored the move. However, there is nothing to suggest that Dwayne does not also have a strong bond with E.B. Therefore, there is no evidence under this factor weighing against E.B.'s removal from Nebraska to be in his father's physical custody in Utah.

### g. E.B.'s Ties to Present Community
### and Extended Family

In Utah, E.B. lives with his two half siblings and three stepsiblings with whom he has a good relationship. Additionally, Dwayne's parents and two of Dwayne's seven siblings live within a 30-minute drive of Dwayne's house, and E.B. has a good relationship with Dwayne's extended family. E.B. also has a good relationship with Megan's extended family who live within 20 minutes of them. Further, E.B. has neighborhood friends.

In Nebraska, E.B. lives with four out of five of his half siblings, plus Brent's two other children. Alexandra's mother appears to also live in the area, and she sometimes provides care for E.B. and his half siblings. Additionally, E.B. has a close relationship with his cousins in Lincoln.

No evidence under this factor weighs against E.B.'s removal from Nebraska to be in his father's physical custody in Utah.

### h. Hostilities Between Parents

We agree with the district court that this factor is, in this case, the weightiest. Both parties are capable and loving parents. However, there has been a lack of cooperation between the parties. Of import here, and as stated by the district court, Alexandra "has simply not understood the need to maintain the flexibility, adaptability and communication required." She has failed to be cooperative regarding parenting time exchanges. But more importantly, she has failed to share important information with Dwayne regarding E.B., e.g., his behavioral issues, and she has made important decisions for E.B., such as getting him baptized, without engaging in meaningful discussions with Dwayne. On several occasions, Alexandra has refused to communicate with Dwayne or answer questions regarding E.B., and instead, she told Dwayne to contact her lawyer. At the time of the original custody order in 2015, the district court was concerned about Alexandra's conduct toward Dwayne. And as stated in its current order, the district court found that Alexandra's conduct "really has not changed," and "[i]n fact, in some ways [her] negative conduct has amplified."

We agree with the district court that Alexandra "has just simply taken positions inconsistent with the responsibilities inherent as primary parent as to cooperation and communication." The district court found that "maintaining the status quo would embolden her in ways that would not be in the child's best interests." We are mindful of the fact that the trial judge heard and observed the witnesses and was in a better position to determine the credibility of the parties. As noted previously, Dwayne is not without fault in this case. His communication and cooperation could be improved. The outcome in this case should make it very clear to both parties that the failure to properly communicate and cooperate with regard to matters pertinent to E.B.'s well-being is not in E.B.'s best interests and that such failures are significantly weighted among other factors when a court considers whether to modify custody.

See *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018) (although not only factor, promotion and facilitation of relationship by one parent with other parent is factor that may be considered when awarding custody).

There is no evidence under this factor which weighs against E.B.'s removal from Nebraska to be in his father's physical custody in Utah, and in fact, this particular factor weighs heavily in support of the removal.

### i. Child's Best Interests Are
### Interwoven With Well-Being
### of Custodial Parent

The best interests of the child are interwoven with the well-being of the custodial parent. *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). In the present case, each parent will continue to live and work in their home states under satisfactory conditions. This factor has little to no application under these circumstances.

### j. Summary of Quality
### of Life Factors

Keeping in mind that we found no abuse of discretion by the district court in concluding that E.B.'s best interests would be better served by placing him in Dwayne's physical custody for the reasons previously set forth, we cannot say that our conclusion is any different after considering these quality of life factors.

### (iii) Impact on Noncustodial
### Parent's Visitation

The final consideration in the best interests of the child analysis is the effect of the child's relocation on the noncustodial parent's ability to maintain a meaningful parent-child relationship. See *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). This effect must be viewed in light of the court's ability to devise reasonable parenting time arrangements. See *id*.

Here, regardless of who has custody, the noncustodial parent would not be able to enjoy the same liberal parenting time that was available before E.B. began elementary school. However, the parenting plan established in the district court's order does its best to minimize the impact on parenting time. Alexandra was awarded regular summer parenting time to commence on the seventh day following E.B.'s release from school for the summer recess and concluding 7 days before school commences in the fall, and regular school year parenting time during E.B.'s fall and spring breaks every year. A Thanksgiving and Christmas break parenting time schedule was also established, and it included extended Christmas break parenting time in odd-numbered years for Alexandra. Additional parenting time was to be provided if Alexandra had the opportunity to exercise parenting time in Utah. And the parties were to work in good faith to allow Alexandra to have additional parenting time as schedules and circumstances allow.

We agree with the district court's finding that

it appears that [Dwayne] is willing to communicate with [Alexandra] and keep her advised of all the issues relative to the minor child. The Court believes ultimately that [Dwayne] will cooperate with [Alexandra] so that she may receive all the information with regard to the minor child without unnecessary limitation. The Court does not believe that would be true if custody remained static.

### (c) Did District Court Abuse Its Discretion?

We previously concluded that the district court did not abuse its discretion in determining that it was in E.B.'s best interests to award his physical custody to Dwayne. Nothing in our review of the removal factors causes us to reach a different conclusion when considering E.B.'s best interests. Accordingly, we cannot say that the district court abused

its discretion in granting Dwayne physical custody of E.B. and allowing him to remove E.B. to Utah.

## VI. CONCLUSION

For the reasons stated above, we affirm the decision of the district court which awarded Dwayne physical custody of E.B. and allowed him to remove E.B. to Utah.

AFFIRMED.