IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

DIXON V. DIXON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

WILLIAM J. DIXON, JR., APPELLANT AND CROSS-APPELLEE,

V.

CARRIE S. DIXON, NOW KNOWN AS CARRIE S. CHANDLER,
APPELLEE AND CROSS-APPELLANT.

Filed June 7, 2022.    No. A-21-492.

Appeal from the District Court for Sarpy County: KIMBERLY MILLER PANKONIN, Judge.
Affirmed in part, and in part reversed and remanded with directions.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Patrick A. Campagna, of Campagna Law Office, P.C., L.L.O., for appellee.

Julie E. Bear, of Reinsch, Slattery, Bear, Minahan & Prickett, P.C., L.L.O., for guardian ad litem.

MOORE, RIEDMANN, and ARTERBURN, Judges.

MOORE, Judge.

I. INTRODUCTION

William J. Dixon, Jr., appeals, and Carrie S. Dixon, now known as Carrie S. Chandler, cross-appeals, from an order of modification entered by the district court for Douglas County. On appeal, William challenges the court's orders regarding custody of the parties' minor children, the denial of his request to relocate the children to California, its determination of child support, and its decision requiring him to pay certain fees. In her cross-appeal, Carrie challenges the court's failure to award her attorney fees and in not allowing the testimony of a certain witness. For the reasons set forth below, we affirm in part, and in part reverse and remand with directions.

- 1 -

## II. STATEMENT OF FACTS

### 1. DECREE AND FIRST MODIFICATION

William and Carrie were married in 2002 and together have three children: Tannor, born in 2000; Connor, born in 2004; and Carter, born in 2008. Tannor is no longer a minor, and we only discuss him as necessary to the resolution of the current appeal.

Proceedings in this case originated in the district court for Sarpy County. Carrie filed for dissolution of marriage in February 2013, and the district court entered a stipulated decree on August 4, 2014. Pursuant to their agreement, the parties were awarded joint legal custody and Carrie was awarded primary physical custody. At the time the decree was entered, William was residing in Chicago, and his parenting time with the children was limited to weekends and extended weeks when the children were available.

In 2015, William filed a complaint to modify, alleging a material change of circumstances; namely, that he was now residing in Nebraska, Carrie's parenting was not in the best interests of the children, and the children had expressed a desire to have equal parenting time with William. While the matter was pending, William moved to California. William then filed an amended complaint to modify, alleging that Tannor had requested to live with William and seeking the removal of Tannor to California.

Carrie filed an answer to William's amended complaint, as well as a cross-complaint for modification. Carrie alleged that William's income had significantly increased, constituting a material change in circumstances. Carrie also filed an application for contempt on the basis that William had failed to return Tannor to Nebraska prior to the start of the school year.

After a 3-day trial, the district court entered an order for modification in February 2017. The court denied William's request for the physical custody and removal of Tannor, finding that Tannor's complaint that Carrie's home was a "toxic environment," was "created largely in part by Tannor's immaturity and disrespect." The court "strongly suggest[ed]" that Tannor become involved in therapy to process issues associated with his parents. Additionally, the court increased William's child support obligation and denied Carrie's application for contempt. The court noted that that "while [Carrie] has demonstrated that [William] influenced Tannor in his decision-making process," the court was unable to find willful disobedience on William's behalf.

The district court also made several credibility findings regarding both parents. The court found William to be "self-centered and authoritarian" and that he "actively encourages Tannor to be argumentative and defiant to his mother." The court pointed to William's change in pleadings as "one example of the inconsistent positions that [William] has taken throughout these proceedings." Carrie was found by the court to be "a credible witness" who was "struggling to parent a child who is openly defiant of her."

### 2. CARRIE'S COMPLAINT TO MODIFY AND PARENTAL ALIENATION ALLEGATION

In November 2017, Carrie filed a complaint to modify, seeking a restriction of William's parenting time to a therapeutic setting, therapy for all three children, and additional restrictions aimed to prohibit William from interfering in the children's therapy. Carrie also filed a motion for ex parte orders, requesting that she be awarded sole legal custody and alleging parental alienation.

On November 17, 2017, the district court entered an ex parte order, which awarded Carrie temporary sole legal custody of the children, required the children to participate in individual therapy, and restricted William's parenting time to occur in a therapeutic setting at the recommendation of a therapist. An order filed on December 15 found that the ex parte order should remain in effect and further ordered that William was allowed to have 30-minute telephone calls with each child every other day, provided that Carrie be allowed to record the calls. The order noted that William was prohibited from discussing the proceedings with the children.

In March 2018, Carrie filed a motion to compel, alleging that Tannor had recorded therapy sessions with his individual therapist without permission and had provided copies of the recordings to William's attorney, Matthew Higgins. Carrie requested that the court order William to provide her with all recordings made by Tannor and "cease and desist [William's] effort to undermine the therapeutic process and the parental authority" of Carrie.

In April 2018, William motioned the district court to appoint an attorney for the children, asserting that the children were in need of "independent representation." Additionally, the parties both filed several motions related to discovery during April and May.

On June 29, 2018, the district court issued a comprehensive order addressing Carrie's motion to compel, William's motion to appoint an attorney for the children, and other discovery matters. The court overruled Carrie's motion to compel, finding that the matter was better reserved for an application to show cause. The court sustained William's motion and appointed John Kinney to serve as the children's attorney, provided that William deposited $2,500 with the clerk to pay Kinney's fees. The court held that its 2017 ex parte order would remain in full force.

### 3. WILLIAMS'S COMPLAINT TO MODIFY AND REQUEST FOR REMOVAL

In August 2018, William filed a complaint for modification and removal, alleging that Carrie's unfitness to continue as the custodial parent and the children's strong preference to reside with William constituted a material change in circumstances. William requested sole physical and legal custody of the children and for authorization to remove the children to reside with him in California. Also in August, Carrie filed a motion to disqualify William's attorney, Higgins, alleging that he would be a witness in the proceedings. Carrie noted that Higgins' testimony would include his communications with Tannor and the receipt of recordings Tannor had made of his therapy sessions. And, in September, William filed a motion to appoint Dr. Cynthia Topf as an evaluator pursuant to Neb. Ct. R. Disc. § 6-335 (Rule 35), so that she may prepare a child custody evaluation.

On September 19, 2018, the district court sustained Carrie's motion to disqualify Higgins. On October 18, Higgins appealed the district court's order. On December 17, this court dismissed Higgins' appeal for lack of jurisdiction. See *Dixon v. Dixon*, 26 Neb. xxxvii (No. A-18-1000, Dec. 17, 2018).

In December 2018, William again filed a motion to appoint Topf as a Rule 35 evaluator, which the court granted on December 20, at William's cost, however, the court ordered that an evaluator was to be selected by mutual consent of the parties. The court additionally ordered that Tannor was permitted to reside with William on a temporary basis until further order. William was required to facilitate telephone calls between Tannor and Carrie, and between Tannor and his siblings. The court ordered the telephone calls be recorded.

On February 11, 2019, the district court designated Dr. Mary Paine to serve as the Rule 35 evaluator, pursuant to William's request. Our record indicates that in April 2019, William and Paine entered into a contract for the preparation of a child custody evaluation.

In March 2019, Carrie filed a motion for attorney fees. On April 19, 2019, the district court, sua sponte, appointed a guardian ad litem (GAL) for the children. The court also ordered William to contribute $5,000 to Carrie's attorney fees.

On April 29, 2019, William filed a complaint to modify his child support obligation due to Tannor temporarily residing with him. William requested that the court reduce his child support obligation and grant him credit based on amounts already paid in 2019. William filed another motion to review and update his child support obligation on June 11.

A hearing on William's complaint for modification of his child support obligation was held on July 12, 2019. In an order entered the same day, the district court reduced William's monthly child support obligation from $2,615 to $2,346, effective August 1, but it did not grant William credit based on amounts already paid in 2019.

During the July 2019 hearing, Kinney made an oral motion to withdraw as the children's attorney. The parties did not object. The district court granted Kinney permission to withdraw on July 15, and on July 29, Kinney filed a motion for determination of fees.

In August 2019, William filed a motion to recuse the district court judge. William alleged that the court's orders were improper under the Nebraska Parenting Act and asserted that the court's prior credibility findings call into question the court's ability to remain impartial in the matter.

In an order entered on September 23, 2019, the district court overruled William's motion to recuse. The court also addressed Kinney's motion for determination of fees, ordering William to pay $3,648. Finally, the court addressed the GAL's report dated August 22. The court noted that the results of the GAL's investigation of the home environment of the children was concerning as the two youngest children appeared to be in crisis. In her report, the GAL recommended that Connor and Carter receive counseling and therapeutic interventions before the case proceeded to trial. Accordingly, the court continued the pretrial hearing to November 1, and it ordered an expansion of the GAL's investigation to determine if there were any impediments to therapy with Jack Dross, the clinician selected by the GAL to offer therapy to Connor and Carter.

In October 2019, Carrie filed a motion to compel William to pay Paine for her contracted services, alleging that William had claimed he was only obligated to pay the initial cost of the child custody evaluation and noting that Paine had informed the parties she required an additional $3,000 to complete her evaluation and prepare a written report. William then filed a motion to quash and discharge Paine as the Rule 35 evaluator, alleging that Paine had not followed the procedure outlined in his contract with her and that her evaluation methods had compromised her role as a neutral party in the proceedings.

On November 13, 2019, the district court entered an order sustaining Carrie's motion to compel and denying William's motion to discharge Paine. The court noted that William had moved for a Rule 35 evaluator in December 2018, the court thereafter selected Paine to conduct the evaluation, and ordered William to pay the costs of the evaluation. The court further found that William's reasons for discharge were more appropriate for cross-examination at trial.

In November and December 2019, the GAL and the parties filed several motions. The GAL filed a motion for fees. She also filed a motion for an attorney to represent her in the proceedings in response to a recent conflict with William. Carrie filed a motion for sanctions, alleging that William had "issued statements impugning the competency and professionalism of case professionals," had knowingly provided false information in an effort to circumvent the court's orders, and had disrupted the children's therapeutic progress. William filed a motion in opposition to Carrie's motion for sanctions, and also sought sanctions against her, arguing that he had been in contact with Dross, was permitted to participate in family therapy, and was in compliance with the court's orders. He also alleged that Connor and Carter "continue to be in crisis." Additionally, William filed a motion in opposition to the GAL's motion for an attorney. He also moved for sanctions against the GAL, arguing that she had contradicted the orders of the court by excluding him from a family therapy session and was acting outside the scope of her duties.

The motions were all addressed by the district court at a hearing on December 12, 2019. William did not appear at the hearing, and calls to his phone went unanswered. The district court took the GAL's motions for an attorney and for fees, and the parties' motions for sanctions, under advisement. In an order entered December 13, the court granted the GAL's motions. It denied Carrie's motion for sanctions but granted an application for contempt filed by her (filing not included in our record). The court ordered William to appear for arraignment on the citation and found that he was "contemptuously and willfully violating" the court's previous orders. Due to various delays, an evidentiary hearing on William's alleged contempt was not held until February 2021 in conjunction with the modification trial.

In June 2020, William filed a motion to disqualify the district court judge, to discharge the GAL, and to vacate prior orders of the court. William argued that the district court judge "has entered orders in the proceedings to the detriment of the defendant without any competent evidentiary or factual basis" and that the "proceedings are infected with such structural errors that a just outcome can only occur with the disqualification" of the district court judge.

On August 4, 2020, the district court denied William's motion to disqualify. However, while disqualification was not required by the allegations raised in William's motion, the court recused itself on its own motion in order to "dispel any thought or suspicion" that any party was not receiving impartial justice. Because the court had discussed the case with all judges in the Second Judicial District, those judges were also recused.

### 4. Reassignment to Douglas County

On August 6, 2020, the case was reassigned to a judge of the Fourth Judicial District.

On September 17, 2020, the district court denied William's most recent motion to disqualify the GAL. On October 6, the court overruled William's motion to disqualify Paine as the Rule 35 evaluator and ordered Paine to produce her report to William's counsel by October 27.

On October 19, 2020, the modification and contempt proceedings were set for a 4-day trial in December. That same day, William filed a civil suit against Paine and her office in Lancaster County Court, alleging multiple claims, including breach of contract, rescission, unjust enrichment, misrepresentation, negligence, and joint and several liability, as well as a demand for a jury trial. William requested a judgment of $11,300, plus costs.

On October 26, 2020, Paine filed an affidavit in the present case detailing the conflict between her and William. The following day, the district court entered an order requiring Paine to complete her Rule 35 report by November 6 and provide the report to the parties. On November 11, Paine filed a motion for an in camera review of her report, in part, because William and Tannor had recently provided Paine's attorney with a signed notification and retraction of their previously provided informed consent.

In November 2020, the district court entered orders ruling on various discovery-related motions filed by the parties. In an order entered on November 12, the court compelled William to sit for his deposition, but allowed him to testify remotely. The court declined William's motion to reconsider its ruling on the exclusion of Paine's testimony and noted that William had previously motioned the court to compel Carrie and their children to participate in the evaluation with Paine. The court ordered Paine to produce her report within 48 hours or her testimony would be excluded at trial.

Paine did not produce a complete report in the allotted time (report was produced on November 13 with addendums provided to William's attorney on November 16). In an order entered on November 23, 2020, the district court ruled on further related motions filed by the parties. The court ordered the exclusion of Paine's testimony at trial but ordered William's attorney to provide Carrie's attorney with any current or future addendums to Paine's report. William's deposition was rescheduled and the court compelled William to be deposed on or before November 30, 2020. The court also ordered that if Connor or Carter were called to testify at trial, they would do so outside the presence of their parents. Finally, the court took a motion for sanctions filed by Carrie under advisement.

In December 2020, Carrie's attorney motioned for a trial continuance due to his recent contraction of COVID-19, which the district court granted, moving trial to February 2021. The court also entered an order allowing William to exercise unsupervised and overnight parenting time in Nebraska during Connor's and Carter's Christmas break.

In January 2021, Carrie filed a motion requesting the district court reconsider its order excluding Paine's testimony, which the court denied.

5. TRIAL

Trial in the modification and contempt proceedings was held over 4 days in February 2021. The following evidence was adduced. Additional details of the trial evidence are referenced as necessary in our analysis.

(a) Carrie

Carrie testified that she previously had a positive relationship with her children, but that Tannor began displaying behavioral problems in February 2017, shortly after the district court had entered its first order for modification. Carrie described Tannor as angry, upset, and refusing to listen.

An altercation between Carrie and Tannor occurred in February 2017. Carrie was preparing dinner for the children when a pizza was delivered. Carrie requested that Tannor bring the pizza to the kitchen to eat with the family. When he did not comply, Carrie and Tannor struggled over

- 6 -

the pizza box and Tannor "kneed" Carrie in the side. Afraid that the physical altercation would escalate, Carrie called the police.

A few weeks later, Carrie removed the doors from all of the children's bedrooms. Carrie noted that she had done so for safety purposes, as the children would sit in front of their bedroom doors to keep her from being able to enter their rooms. Sometime later Carrie returned the bedroom doors, but the children's behavior did not improve.

In the spring of 2017, the children were on the phone "nonstop" with William. Carrie noted that, "the conversations had increased so much so that a lot of times they wouldn't even come to dinner." In that same period, Carrie noticed that Tannor, Connor, and Carter also began to withdraw from her and their extended family. The children began having strained communications with Carrie. For example, in April, Carrie did not know that Tannor was planning to attend prom until he walked out of her home wearing a tuxedo. Soon after, the children stopped participating in their regular extracurricular activities. After 5 years of taking dance lessons, Tannor stopped participating following his recital in May. Connor and Carter both quit playing baseball in July and have not participated in another sport since.

To discipline the children, Carrie confiscated their cellphones from April to June 2017. Carrie conceded the children primarily used their cellphones to communicate with William. However, Carrie noted that she had a house phone which the children could have used to speak to William.

The children spent 45 days during the summer of 2017 with William. Carrie noted that the children's behavior escalated following this extended parenting time with William. When the children returned to Carrie's home, they stopped talking to her, removed photographs and family memorabilia from their rooms, and threw their personal belongings and newly purchased school clothes into garbage bags. The children also refused to eat the meals which Carrie had prepared. Carrie has not eaten a meal with her children since September 2017. Over the fall of 2017, the children's relationship with Carrie continued to deteriorate to the point where the children refused to ride in a car with her, would not communicate with her in any way, and would record videos of her inside of her home.

While the 2017 ex parte order allowed William to have 30-minute telephone calls with each child every other day, William had not called the children since that time. Carrie did not believe this to be coincidental, implying that William was communicating with the children another way.

Carrie testified that her relationship with the children did not improve in the following years. Carrie repeatedly took the children to see various clinicians to assist them in processing the family dynamics. Evidence submitted by Carrie cataloging the children's therapy appointments reflects that since the spring of 2017, the children have seen seven different clinicians. Carrie believes that because William has not offered encouragement regarding therapy, the children have not actively participated in it.

Carrie saw her own therapist weekly to discuss how she could be available to her children. Carrie testified that she also worked closely with the GAL and Dross in an effort to coordinate strategies and supports for the children.

Following an impromptu therapy session with William in November 2019, Connor and Carter refused to return to Carrie's home, and instead lived at William's parent's home for 1 month.

During that month, Carrie spent time at William's parent's home in an effort to interact with the children. She also brought Connor and Carter meals there on the weekends and assisted William's parents with chores.

Since Tannor moved to California in December 2019, Carrie has had minimal contact with him. Carrie has not received Tannor's new phone number or address, and has no way to get in touch with him.

In January 2020, Connor's and Carter's negative behaviors continued. Connor and Carter would not inform Carrie of their whereabouts, and occasionally would not return home. One evening, after Connor and Carter refused to return home or to respond to text messages and calls from Carrie and other family members, Carrie called the police. As a result, Connor and Carter had to participate in a diversion program.

Carrie did not hear from Connor or Carter when they spent extended parenting time with William during Christmas of 2020. Carrie testified that since the children returned from this parenting time with William they have "completely ignored" her.

(b) William

William testified that in the spring of 2017, he was made aware that the children were upset "quite often." The children had told William that Carrie's extended family was frequently at the home to enact discipline and that a lot of arguing was occurring. William noted that he was unable to intervene because he was in California, but he did calm the children and spoke with Tannor about beginning therapy.

William experienced an interruption in his communication with the children when Carrie confiscated their cellphones from April to June 2017. Carrie had notified William about confiscating the children's cellphones but did not provide him with a reason for the discipline. William did not call his children after the ex parte order was entered in November 2017, because it conditioned William's phone calls on Carrie's ability to record them. William believed that allowing Carrie to record the calls would provide her with an opportunity to manipulate his conversations.

Tannor moved to California to live with William in December 2018. However, because the 2017 ex parte order limited William's parenting time to a therapeutic setting, the first time William had an in-person visit with Connor and Carter since the entry of the order was in November 2019 in Dross' office. William testified that Dross agreed to facilitate a "reunification" session with William and Connor and Carter. After William had notified the GAL and Carrie's attorney about the scheduled therapeutic visit, the GAL canceled the visit. William testified that, because he was already in town from California, he met with Dross individually. Twenty minutes into William's meeting with Dross, Connor and Carter knocked on Dross' door. William had not expected Connor and Carter at this individual meeting. Dross let Connor and Carter into his office, and William described the visit as "a very emotional time." William and Connor and Carter then had a 50-minute session with Dross. After this, William did not see Connor or Carter again until December 2020.

When discussing his desire to move Connor and Carter to California, William described what a routine would look like for the children there, including attending school, completing household chores, and participating in activities. William named the middle and high schools

which Connor and Carter would attend. William also noted that he would like Connor and Carter to develop a relationship with his infant son, whom he had with his second wife in California. When asked how he planned to help restore the relationship between Carrie, Connor and Carter, William responded that he would do whatever was ordered by the court. When pressed to detail the emotional and therapeutic supports he would provide to Connor and Carter, William stated that he would communicate, encourage, and "[d]o what needs to be done."

### (c) Tannor

Tannor's testimony about struggling with Carrie over a pizza in February 2017 was consistent with Carrie's testimony. However, Tannor also testified that he and Carrie had a poor relationship years before the 2017 order for modification and physical altercation. He described his relationship with Carrie since 2015 as being very tense with no contact but "a lot of animosity and name calling."

Tannor testified that during the months Carrie had confiscated his cellphone in 2017, he was unable to communicate with William. According to Tannor, the phone in Carrie's home did not ring, so Tannor would miss phone calls from William.

Tannor testified that from April to July 2017, Carrie enlisted members of her extended family to come to her home and make disparaging comments about William to the children. Tannor stated that Carrie's family members made these remarks to the children every weekday when they returned home after school. Tannor also described instances in which Carrie's family members would make video recordings of Tannor, including when he was walking around Carrie's neighborhood or completing homework in his bedroom.

Tannor graduated early from high school in December 2018 and began living with William in California that month. Tannor lived with William until September 2019, when he began his studies at a nearby university and moved to campus. Since moving to California, Tannor has not made any phone calls to Carrie, nor to anyone on either side of his extended family. Tannor also has not seen a therapist since he moved to California.

### (d) Connor and Carter

Connor testified that prior to 2017, he always got along well with William and self-identified as a "daddy's boy." However, Connor has not gotten along with his mother for 2 or 3 years and believes that Carrie is not promoting a relationship between William and the children. Connor expressed a desire to live with William in California because he felt there was less tension at William's home.

Connor testified to recording therapy sessions with a previous therapist using his phone, though he was unable to recall how many sessions he recorded. Connor noted that he recorded the sessions for his own safety, as the therapist had previously raised his voice during sessions with the family. Connor did not find therapy with Dross helpful, as the nearly year of sessions with Dross did not accomplish mending the relationship between Carrie and Connor. However, Connor identified his high school counselor as a support and "the only one I really can trust."

Carter testified that he was "very happy" to see his father during the Christmas of 2020 as he had not spent time with his father since the summer of 2017. Throughout Carter's testimony, he stated that Carrie did not want the children to see or speak to William. When asked where Carter

would like to live, he responded that he would like to live with William. However, Carter reasoned that, "my mom doesn't really want me to have a relationship with my dad. And then when I move with my dad, I bet he'll let me have a relationship with my mom. So I can have a relationship with both of my parents."

Both Connor and Carter testified that they are performing well academically and have friends at school.

### (e) Extended Family

William's father testified that he had a limited relationship with Tannor once Tannor moved to California. William's father did not believe that his relationship with Connor or Carter would improve should they be removed to California. He observed that his relationship with his grandsons was "on a tough communication basis."

Carrie's mother testified that she had previously had a good relationship with Tannor, Connor, and Carter. She described attending the children's activities, hosting family dinners, and engaging in holiday traditions with her grandchildren. However, Connor and Carter have not spoken to Carrie's mother since 2017. She has not seen or heard from Tannor since he moved to California. Additionally, none of the children contacted Carrie's mother during a recent hospitalization.

### (f) Dross

Dross, a licensed mental health practitioner, began seeing Connor and Carter for weekly, joint therapy beginning in September 2019. Dross testified that the children were unwilling to mend their relationship with Carrie as they would reject any suggestion offered by Dross. Dross was unable to determine why Connor and Carter were not participating meaningfully in therapy, but found their lack of cooperation concerning. By the summer of 2020, Dross' sessions with Connor and Carter had become inconsistent as the children would send "last minute" text messages to cancel their scheduled appointments. Connor also texted Dross that he felt "oppressed" in Dross' office.

Dross testified that he provided Carrie with parenting and communication strategies. Carrie kept Dross informed about whether his recommended strategies had been successful. Dross could not recall whether he had provided any strategies or recommendations to William. Dross noted that Connor and Carter needed encouragement from William to participate in therapy because the children had polarized views of their parents, viewing William as "all good" and Carrie as "all bad."

Dross testified about the November 2019 meeting with William. Dross testified that he "wasn't sure what to do" when the meeting was interrupted by the arrival of Connor and Carter, but he allowed them to come in for a short session because he wanted to see how William interacted with the children. Although Dross allowed the interruption, he testified that having a family session or a therapeutic visit was "not the plan." Dross and the GAL had discussed therapeutic visitation between William and the children, but Dross had determined the family was not yet ready for it in November 2019.

## (g) Paine

Paine was called by Carrie's attorney to make an offer of proof regarding Paine's evaluation of the family, as well as her report and recommendations.

Paine stated that though William expressed a desire for the children to be in therapy during the family's evaluation, "what he said did not comport with what he did." Paine noted that in January of 2020, she asked all parties for a preliminary status conference, but did not receive a response from William despite several attempts to contact him. The preliminary status conference was never scheduled, although the children were exhibiting "a very obvious need for treatment."

Paine observed that Tannor, Connor, and Carter all displayed symptoms of severe parental alienation, and found that William was alienating the children from Carrie. When asked if Paine had ever informed William that he was the cause of the alienation, Paine responded that she had "talked with Mr. Dixon about that face to face," in a meeting with him on February 21, 2020. Paine also communicated to William that the children's alienation required a specific therapeutic intervention.

### 6. FINAL MODIFICATION AND CONTEMPT ORDER

On May 14, 2021, the district court entered a detailed order of modification. The court reviewed the procedural background, the evidence adduced at trial, and made significant factual findings. In connection with Carrie's complaint to modify, the court concluded that there had been a material and substantial change in circumstances requiring a modification of the decree, including:

1. The minor children have rejected [Carrie] and take extreme measures to avoid socialization and communication with her;

2. [Carrie] made concerted efforts to secure therapeutic aid for herself and for the children to address the family rift; however, those efforts were not successful;

3. [William] has not supported therapy for the minor children with the goal of repairing the relationship between the children and their mother. This lack of support was detrimental to the minor children and facilitated the progressive deterioration of the relationship between [Carrie] and the minor children;

4. [William] lives in the State of California with his wife and their new child;

5. The relationship between [Carrie] and [William] has deteriorated to the point where they are not able to communicate and share decision-making power; and

6. Additional evidence adduced at trial substantiates the need for a change of legal custody for the best interest of the minor children to ensure they receive the services they require.

The court found that both parties are fit and loving parents. However, the court found that it was in the best interests of Connor and Carter to award Carrie their legal and physical custody, subject to William's parenting time as set forth in the original decree. Because the court found that further therapy is not likely to improve the situation or be in the best interests of the children, the court did not grant Carrie's requested relief regarding court-ordered therapy and it terminated prior orders regarding therapeutic processes. The court found that the evidence at trial was "ultimately

insufficient" to prove Carrie's allegation of parental alienation, but acknowledged that the family had "perhaps the saddest case of parental estrangement" that had come before it.

Turning to William's complaint for modification and removal, the court noted William's allegations regarding a material change in circumstances:

1. That Carrie is unfit to serve as custodial parent;

2. That Carrie's home environment is wanting and detrimental to the children's wellbeing;

3. That Carrie's emotional relationship, attitude, stability and parental capacity are all detrimental to the children's wellbeing;

4. That all three children have a strong preference to be placed in William's care;

5. That Carrie restricted the children's contact with William;

6. That Carrie promoted limitations on communications between the children and William; and

7. That Carrie withhold information regarding the health and safety of the minor children.

The district court found that William failed to meet his burden of proof in regard to these allegations. The court acknowledged the boys' stated preference to live with their father, however it found the evidence at trial showed that they are appropriately provided for in their mother's home. The court noted that Carrie has gone to great lengths to try to address the children's mental health needs, the children are doing well in school, and they have friends in Nebraska. The court found the testimony established that Carrie provides a clean, safe, and appropriate home for the children.

The court then analyzed the best interests of the children in accordance with the caselaw addressing relocation of children to another jurisdiction. After thoroughly reviewing the appropriate factors, the district court found that the evidence did not support removal of the children to California.

Regarding the children's access to cellular telephones, the district court ordered William to continue providing such telephones to the children, which they may use to contact their noncustodial parent. The court ordered both parties not to remove the telephones from the children for more than 24 hours at any time.

The district court denied Carrie's application for contempt. The court ordered that the GAL fees (totaling $6,921) be divided equally between the parties, that William pay the fees for the GAL's attorney in the sum of $1,986.22, and that each party be responsible for their own outstanding attorney fees. The court denied William's request to be refunded for funds he paid to Kinney in connection with this matter. Finally, the court declined to modify the amount of child support ordered during the period Tannor lived with William before reaching the age of majority.

## III. ASSIGNMENTS OF ERROR

Williams assigns 15 errors on appeal which we have consolidated and rephrased as follows: The district court erred in (1) disqualifying William's former attorney; (2) failing to award him sole legal and physical custody of the children and in denying his request to move the children to California; (3) appointing a GAL and an attorney for the GAL; (4) ordering William to pay any of

the fees for the GAL, the GAL's attorney fees, and the fees of John Kinney; (5) not reducing his child support obligation upon permitting Tannor to live with him and not ordering Carrie to reimburse William for his overpayment; and (6) awarding Carrie temporary attorney fees and not awarding him all of his attorney fees.

In her cross-appeal, Carrie assigns as error the district court's failure to award her attorney fees and in not allowing Paine's testimony.

## IV. ANALYSIS

### 1. DISQUALIFYING WILLIAM'S FORMER ATTORNEY

William alleges that there was no evidence to support the disqualification of his attorney, Higgins.

In the order disqualifying Higgins as William's attorney, the district court noted that Tannor had created unauthorized recordings of his therapy sessions and that the recording were provided to Higgins by Tannor. The court was also concerned that Connor and Carter had begun to make their own recordings. After receiving the recordings, Higgins informed the court that he had contacted the Nebraska Supreme Court Counsel for Discipline to discuss his ethical obligations. The court observed that Higgins had filed an affidavit to testify to the events upon the filing of Carrie's motion to disqualify. The court then found that Higgins was a necessary witness, and thus was prevented from acting as William's advocate at trial.

A motion to disqualify an attorney is addressed to the discretion of the trial court, whose findings will not be disturbed absent evidence of abuse. *McCully, Inc. v. Baccaro Ranch*, 279 Neb. 443, 778 N.W.2d 115 (2010). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Schmid v. Simmons*, 311 Neb. 48, 970 N.W.2d 735 (2022).

When a party seeks to disqualify an opposing attorney by calling that attorney as a witness, the court must strike a balance between the potential for abuse and those instances where the attorney's testimony may be truly necessary to the opposing party's case. *Beller v. Crow*, 274 Neb. 603, 742 N.W.2d 230 (2007), *overruled on other grounds, Heckman v. Marchio*, 296 Neb. 458, 894 N.W.2d 296 (2017). The party moving to disqualify an opposing attorney bears the burden of establishing that the attorney's testimony will be necessary. *Id*. A court cannot order disqualification simply upon the moving party's representation that the lawyer it seeks to disqualify is a necessary witness; the key is the evidence showing that the lawyer is a necessary witness. *Id*. A party seeking to call opposing counsel can prove that counsel is a necessary witness by showing that (1) the proposed testimony is material and relevant to the determination of the issues being litigated and (2) the evidence is unobtainable elsewhere. *Id*. In its order disqualifying William's attorney, the district court found that the two prongs in *Beller* had been met. We agree.

Regarding the first prong of *Beller*, the information relayed from the children to Higgins, and potentially William, is material and relevant to determine whether William was manipulating the children and attempting to leverage his position as the preferred parent to achieve a favorable outcome in the proceedings, or whether the children were attempting to make their preferences and positions known. We note that in its 2017 order for modification, the district court specifically found that Tannor was "highly susceptible" to his father's influence, and that William had utilized

this susceptibility to further his own interests. Therefore, the unauthorized recordings of the children's therapy sessions were material and relevant to the dynamics of the family throughout these proceedings.

Regarding the second prong of *Beller*, we must analyze the manner in which Higgins received the recordings in addition to the recordings themselves. The children's recordings may not have been obtained through other means and even if they were, only Higgins is able to answer when the children provided him the recordings, the manner in which they provided him the recordings, and whether the information and recordings were then relayed by him to William.

Because Higgins' proposed testimony was material and relevant to the determination of the issue being litigated and because the evidence was unobtainable elsewhere, the district court did not abuse its discretion in disqualifying Higgins from representing William in the proceedings. This assignment of error fails.

## 2. REQUEST FOR SOLE CUSTODY AND REMOVAL

William alleges that the district court erred in not awarding him legal and physical custody of Connor and Carter and in not allowing him to remove them to California. William argues that there had been a material change in circumstances, namely the breakdown in the relationship between the children and Carrie, and that awarding him sole custody was in the best interests of the children. William contends that the children's relationship with Carrie would improve if they were in William's custody and living with him in California.

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Id*.

In cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. If this burden is met, then the court must make a determination of whether removal from the jurisdiction is appropriate. See, *Burton v. Schlegel*, 29 Neb. App. 393, 954 N.W.2d 645 (2021); *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013).

### (a) Material Change in Circumstances

In cases involving the modification of child custody, a material change of circumstances constituting grounds for modification means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Burton v. Schlegel, supra*.

The district court found that William had failed to meet his burden of proof in regard to the allegations in his complaint to modify. While we agree that William did not prove his allegations related to Carrie's fitness or capacity as a parent, we find that William's allegations regarding the

- 14 -

children's "strong preference" to be placed with William and the deterioration of the relationship between the children and Carrie does constitute a material change in circumstances.

Nebraska appellate courts have found a material change in circumstances based on the child's preference and the deterioration of a parent-child relationship. See, *State on behalf of Slingsby v. Slingsby*, 25 Neb. App. 239, 903 N.W.2d 491 (2017); *Floerchinger v. Floerchinger*, 24 Neb.App. 120, 883 N.W.2d 419 (2016); *Miles v. Miles*, 231 Neb. 782, 438 N.W.2d 139 (1989). Both Connor and Carter provided in camera testimony and both were clear in their desire to reside with William in California. Additionally, while the relationship between Carrie and Tannor was strained at the time the February 2017 order for modification was entered, the relationship between Carrie, Connor and Carter has clearly worsened since then.

We are also unable to reconcile the district court's finding that Carrie's allegation in her November 2017 complaint for modification, regarding the deterioration of the parent-child relationship, constituted a material change in circumstances sufficient to enter ex parte orders and award her sole legal custody (and retain physical custody), and the court's finding that William's allegation in his complaint for modification, also related to the deterioration of the relationship between Carrie and the children, did not evidence a material change in circumstances. Because both parents alleged similar allegations regarding the status of the relationship between Carrie and the children, and because Carter and Connor expressed a preference to live with William, we find a material change in circumstances occurred, and proceed to the second step of our analysis.

(b) Best Interests

The next inquiry is whether the best interests of the children compel a change of custody.

Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Burton v. Schlegel, supra*.

Carrie has been the custodial parent of Connor and Carter since the 2014 dissolution decree awarded her primary physical custody. Testimony at trial evidenced that Carrie provides a clean,

safe, and appropriate home, and provides for the children's physical needs. The children are also excelling academically.

Carrie appreciates the need for therapeutic intervention to mend the relationship between her and the children. Carrie has sought individual counseling for herself and has provided therapy to Connor and Carter. However, these efforts have been largely unsuccessful in improving the relationship between Connor, Carter and Carrie. It is clear that the emotional needs of the children are not being met while in Carrie's home, despite her determined efforts at therapeutic intervention.

The district court also observed that William contends that removing Connor and Carter to California will allow for the emotional needs of the children to be met. However, when asked at trial how he planned to support the children therapeutically, he responded only that he would do whatever is legally ordered of him. We are concerned that William offered no evidence as to what specific interventions or supports in California would meet the emotional needs of the children.

Although not a completely determinative factor, the promotion and facilitation of a relationship by one parent with the other parent is a factor that may be considered when awarding custody. *Burton v. Schlegel*, 29 Neb. App. 393, 954 N.W.2d 645 (2021). While Connor and Carter have clearly expressed their desire to reside with William, there is some evidence to suggest that the children's relationship with Carrie may become even more damaged should the children move. We note that after Tannor moved to California he changed his phone number, had limited to no communication with Carrie, and Carrie is unaware of Tannor's current address. William also did not facilitate any communication between Connor, Carter and Carrie while the children were with him for extended parenting time during the Christmas of 2020.

Because William has not detailed how he would therapeutically support Connor and Carter in California and because William has not facilitated a relationship between Carrie and the children during time spent with the children, we do not find granting William physical custody to be in Connor and Carter's best interests. Therefore, the district court did not abuse its discretion when it denied granting physical custody to William.

### (c) Removal

Since we have found that the district court did not abuse its discretion when it denied granting physical custody to William, we do not address William's argument related to removing Connor and Carter to California. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Baker-Heser v. State*, 309 Neb. 979, 963 N.W.2d 59 (2021). This assignment of error fails.

### 3. Appointing GAL and Attorney for GAL

### (a) Appointing GAL

William alleges that the district court erred in appointing a GAL for the children. He argues that because the children were already represented by an attorney at the time the court appointed a GAL, the appointment was void. William also contends that the GAL acted beyond the scope of her duties by issuing subpoenas and offering evidence to the court, and that it was inappropriate for the GAL to have prevented William from joining Connor's and Carter's therapy session with Dross in November 2019.

*(i) Timing of GAL's Appointment*

Neb. Rev. Stat. § 42-358 (Reissue 2016) authorizes a court to appoint an attorney *or* GAL to protect the interests of minor children and allows the attorney or GAL to recover his or her fees. *Mitchell v. French*, 267 Neb. 656, 676 N.W.2d 361 (2004) (emphasis added). See, also, *Mathews v. Mathews*, 267 Neb. 604, 676 N.W.2d 42 (2004). The appointment of a GAL or attorney under this authority is entrusted to the discretion of the court. See *Chalupa v. Chalupa*, 220 Neb. 704, 371 N.W.2d 706 (1985). Such an appointment may be done at the request of a party or upon the court's own motion. See *Ford v. Ford*, 191 Neb. 548, 216 N.W.2d 176 (1974) (district court, either on motion or sua sponte, may appoint legal counsel to protect interests of minor children of parties to divorce action). A GAL may be an attorney, but an attorney who performs the functions of a GAL does not act as an attorney and is not to participate in the trial in an adversarial fashion such as calling or examining witnesses or filing pleadings or briefs. *Betz v. Betz*, 254 Neb. 341, 575 N.W.2d 406 (1998).

The children's GAL was appointed sua sponte by the district court on April 19, 2019. At the time, the children were already represented by an attorney. The court had appointed Kinney on June 29, 2018, after sustaining William's motion for the appointment.

We note that in dissolution cases, a GAL and a children's attorney serve different roles. The GAL's duties are to investigate the facts and learn where the welfare of his or her ward lies and to report these facts to the appointing court. See *Betz v. Betz, supra*. An attorney appointed under § 42-358 protects the preferences of the children, makes independent investigations, and causes witnesses to appear and testify on matters pertinent to the welfare of the children. See § 42-358(1).

Both professionals aided in articulating the children's preferences and their best interests for the consideration of the district court. Given the circumstances of the case, the appointment of both the GAL and Kinney was not an abuse of discretion.

*(ii) Scope of GAL's Duties*

We next turn to William's argument that the GAL, who is an attorney, acted beyond the scope of her duties. He points to the GAL issuing and serving a subpoena on the Nebraska Department of Health & Human Services and Project Harmony on August 13, 2019, filing a motion requesting a psychological evaluation of Connor on January 24, 2020, filing a praecipe for the issuance of a witness subpoena for Paine on June 17, and offering evidence in the form of her own letters to the district court as inappropriate behavior for a GAL. Upon our review of the record, we find attempting to subpoena a trial witness was the only inappropriate action taken by the GAL.

The GAL served a subpoena on the Nebraska Department of Health & Human Services and Project Harmony to obtain the release of forensic interviews of the children. This action falls squarely in the GAL's duty to investigate facts. See *Betz v. Betz, supra*. The letters the GAL offered to the court were attached to her court-ordered GAL reports, and were correspondence between the GAL and other professionals on the case, such as Paine and Dross. Additionally, the GAL's motion requesting a psychological evaluation of Connor was filed per the recommendation of Dross, and was within the scope of the district court's instruction that the GAL determine whether there were impediments to therapy with Dross. None of these actions caused the GAL to participate in the trial in an adversarial fashion.

In contrast, issuing a subpoena for Paine to appear as a witness at trial did amount to participation in the trial in an adversarial fashion. Therefore, this action was inappropriate and beyond the scope of the GAL's duties. However, in an order entered on September 17, 2020, the district court found that the GAL "should not be the party to call witnesses for trial" and quashed the GAL's subpoena for Paine. As such, there was no prejudice to William by virtue of the GAL's attempt to subpoena Paine and no error committed by the district court.

### (iii) GAL and Therapeutic Interventions

Finally, William argues that it was inappropriate for the GAL to have prevented William from joining the children's therapy session with Dross in November 2019. While William contends that his attending a therapy session with the children was specifically approved by Dross, at trial Dross testified that though he and the GAL had discussed therapeutic visitation between William and the children, "we hadn't gotten to that in November of 2019, we were not there yet." William had not been invited to Dross' office for therapeutic visitation, but rather for a private meeting with Dross.

Because the ex parte order entered by the district court in November 2017 ordered only therapeutic visitation between William and the children "at a frequency determined by the therapist" and the record reflects that Dross had not yet recommended therapeutic visits in November 2019, it was appropriate for the GAL to have canceled the children's session with Dross.

### (b) Appointing Attorney for GAL

William also argues that the district court erred when it appointed an attorney to represent the GAL. He argues there is no authority for a court to appoint an attorney to represent a GAL.

On November 26, 2019, the GAL filed a motion seeking the appointment of an attorney to represent the GAL in the proceedings. The motion referenced William attempting to join Connor's and Carter's therapy session in November 2019. The motion noted that the GAL had been made aware that William had scheduled a family therapy session between himself and Connor and Carter with Dross. The GAL did not believe the family therapy session conformed to the previously entered court orders and informed William of this. William then sent an email stating that "[the GAL] enabled Carrie Chandler in parental alienation," and that William had "already created a grievance with the State of Nebraska Counsel for Discipline of the events that transpired." The GAL requested an attorney because she was "only attempting to follow Court Orders" and because William's email "could be interpreted as foreboding in nature." In an order entered on December 13, the district court appointed an attorney for the GAL and stated that the "[a]ssignment of attorney fees and costs shall be determined at a future hearing."

The Supreme Court of Nebraska has considered the issue of GALs requesting their own counsel. See *Betz v. Betz*, 254 Neb. 341, 575 N.W.2d 406 (1998) (should GAL feel that he or she needs attorney, GAL should apply to appointing court for permission to retain attorney to represent GAL). Under the circumstances of this case, we find the district court did not abuse its discretion when it appointed the GAL an attorney. This assignment of error fails.

## 4. FEES OF GAL, GAL'S ATTORNEY, AND KINNEY

William alleges the district court erred when it ordered him to pay any of the fees of the GAL, the GAL's attorney, and Kinney, the children's attorney. We address each fee in turn.

### (a) GAL's Fees

In the April 2019 order appointing the GAL, the parties were ordered to each deposit $1,000 with the clerk of the district court to cover the initial cost of the GAL. On November 12, the GAL filed a motion for fees, requesting $2,647 for 29.85 hours of work performed on the case since her appointment. The district court sustained the GAL's motion for fees on December 13. The court ordered that Sarpy County pay the GAL's fee of $2,647.

At a hearing on March 8, 2021, the GAL again motioned for fees and submitted an affidavit which requested $6,921 for 74.60 hours of work performed on the case. Also at the hearing, a deputy county attorney for Sarpy County appeared and asserted that because neither Carrie nor William had made a show of indigency, the county may not be taxed for the GAL's fees.

In the May 2021 modification order, the district court found that the GAL's fee request for $6,921 was reasonable and directed the clerk of the district court for Sarpy County to remit the $2,000 which Carrie and William had initially deposited in 2019, as the deposit had not yet been paid to the GAL. The court ordered that the remaining $4,921 be split evenly between Carrie and William, as the court had previously ordered an even split in the deposit to the clerk for the GAL's initial fees.

Through § 42-358(1), the Legislature has determined that the work of an attorney or a GAL appointed to represent the interests of the minor children in a dissolution action is for a public purpose only when a responsible party to the dissolution is indigent. See *White v. White*, 296 Neb. 772, 896 N.W.2d 600 (2017). Alternatively, dissolution courts have the power to order that the underlying parties be jointly and severally liable for the payment of the court-appointed attorney fees. See *id*. Allowance, amount, and allocation of a GAL fee are matters within the initial discretion of the trial court, necessarily involve consideration of the equities and circumstances of each particular case, and will be set aside on appeal only when there appears to be an abuse of discretion by the trial court. *Coffey v. Coffey*, 11 Neb. App. 788, 661 N.W.2d 327 (2003).

We find no abuse of discretion in the district court's determination that the GAL's fees were reasonable and that Carrie and William should be jointly liable for the fees.

### (b) GAL's Attorney Fees

In the December 2019 order appointing the GAL an attorney, the district court stated that the assignment of attorney fees and costs would be determined at a future hearing. At a hearing in March 2021, the GAL's counsel motioned for fees and submitted an affidavit which requested $32.97 in expenses and compensation for 19.45 hours of work performed on the case. In the 2021 modification order, the district noted that Sarpy County District Court pays court-appointed attorneys at a rate of $85 per hour for out-of-court matters and $125 per hour for in-court matters. The court found that the GAL's attorney's request for fees for 19.45 hours, including 7.5 in-court hours, plus $32.97 in costs, was reasonable. The amount of fees totaled $1,986.22. The district court then found that because the appointment of an attorney for the GAL was required only due

to William's "hostile actions" towards the GAL, William was ordered to pay the entirety of the GAL's attorney's fee.

A review of the record demonstrates that William filed multiple motions to discharge the GAL and sent the GAL a charged email in which he stated that he had contacted the Nebraska Supreme Court Counsel for Discipline to file a grievance regarding the dispute over William attempting to join the children for a therapy session in November 2019. The record reflects contentious proceedings and we agree that William's hostile actions was the sole reason the GAL motioned the court for the appointment of an attorney. An appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in its award of attorney fees. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020). We do not find an abuse of discretion by the district court.

### (c) Kinney's Fees

In April 2018, William motioned the district court to appoint an attorney for the children. The court sustained William's motion and appointed Kinney to serve as the children's attorney, provided that William deposited $2,500 with the clerk of the district court to pay for Kinney's fees.

Following Kinney's withdrawal from the case, he filed a motion for determination of fees. Attached to Kinney's motion was an itemization of billing services rendered while he was appointed to serve as the children's attorney. Kinney stated that from July 2, 2018, to July 15, 2019, he had performed 23.6 hours of work on the case. Kinney noted his hourly rate was $300 per hour, and requested $7,080, plus an additional $216 in paralegal fees, for a total of $7,296.

At a hearing in August 2019, William objected to Kinney's request for fees. William also submitted an affidavit to the district court which asserted that Kinney had not properly represented the children in the proceedings, and as such his requested fees were unreasonable. In an order entered on September 23, the court noted that it had reviewed Kinney's itemization of billing services and found Kinney's hours and costs to be reasonable. Additionally, the court noted that Kinney had been appointed by the court at William's request. The court concluded that Kinney's request for fees should be granted in the amount of $3,648. The court reasoned that this reduction in Kinney's fee request balanced the complexity of the issues involved in the case against William's claim that Kinney was not responsive to the children's needs and concerns.

We do not find an abuse of discretion in the court's award of fees to Kinney, and requiring William to pay the fees.

This assignment of error fails.

### 5. CHILD SUPPORT OBLIGATION AND OVERPAYMENT

William asserts that his monthly child support obligation should have been reduced beginning on January 1, 2019, to reflect the split custody arrangement after the district court allowed Tannor to reside with William on a temporary basis. William argues that the court should have adopted his split custody child support calculation, which was attached to his motion to modify child support in April 2019. William calculated that he was to pay $1,542 in child support per month following Tannor's move. William contends that "Carrie received a staggering windfall of child support from William in 2019" and that Carrie should be required to reimburse William $9,119 for his overpayment of child support. Brief for appellant at 49.

In Nebraska, the general rule for support overpayment claims is that no credit is given for voluntary overpayments of child support, even if they are made under a mistaken belief that they are legally required. *Jameson v. Jameson*, 13 Neb. App. 703, 700 N.W.2d 638 (2005). See, also, *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015); *Palagi v. Palagi*, 10 Neb. App. 231, 627 N.W.2d 765 (2001). However, exceptions to this general rule are made when the equities of the circumstances demand it and when allowing a credit will not work a hardship on the minor children. See *Jameson v. Jameson, supra*. Whether overpayments of child support should be credited retroactively against child support payments in arrears is a question of law. *Palagi v. Palagi, supra*. An appellate court has an obligation to reach an independent conclusion on questions of law. *Id*.

In this case, there is no evidence or suggestion that the resolution of this dispute will impact Connor and Carter, the minor children still supported by William's child support obligation, or cause them hardship; thus, the question is whether the equities demand that William be given the credit.

An order entered by the district court in December 2018, permitted Tannor to reside with William on a temporary basis. William motioned for the court to modify his child support obligation in April 2019 and again in June. On July 12, the court reduced William's monthly child support obligation from $2,615 to $2,346, effective August 1, and did not grant William credit based on amounts previously paid earlier in 2019. The amount of William's reduced obligation corresponded to the amount William was ordered to pay for two minor children in the 2017 modification order ($2,615 per month for three children beginning March 1 and $2,346 when only two minor children remained). However, the modified child support did not take into consideration that William had the physical custody of Tannor by using a split custody calculation.

While Tannor was permitted to temporarily reside with William in December 2018, William did not move for a modification of his child support obligation until April 2019. Additionally, after the district court reduced William's obligation in July, Tannor reached the age of majority in September and no longer needed to be factored into William's child support obligation. Therefore, William's alleged overpayment of child support occurred for only a few months. Additionally, at trial, Carrie testified that she earns $44,000 annually and William testified that he earns $305,000 annually. Under these circumstances, we find that the equities do not demand that William be given the requested credit or that Carrie be required to reimburse William. This assignment of error fails.

6. ATTORNEY FEES FOR PARTIES

The parties both assign errors regarding the district court's award or failure to award them costs and attorney fees. Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id*. A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution and modification cases. *Id*.

## (a) Carrie's Temporary Attorney Fees

William argues that the court abused its discretion when it awarded Carrie $5,000 in temporary attorney fees and that Carrie should reimburse William for this amount.

Carrie moved for attorney fees in March 2019, alleging that William was filing motions with "little to no merit" with the intention of depleting her financial resources. Carrie asserted that she would be unable to prepare for trial and protect the best interests of the children should William be allowed to exhaust her financial resources. Carrie requested that the court order William to pay a portion of her attorney fees as she awaited trial. In April 2019, the district court sustained Carrie's motion and ordered William to contribute $5,000 to Carrie's attorney fees.

In its 2021 modification order, the district court declined William's request to modify its previous order awarding Carrie $5,000 in attorney fees. Upon review of the record, we find that prior to Carrie requesting attorney fees, William had filed several motions, including motions for clarification, for specific findings of fact, to compel, to vacate prior orders, and for modification and removal. The record also demonstrates contentious discovery proceedings and that William's attorney had attempted to file improper or inaccurate pleadings. While we are unable to determine William's motivations in filing these various motions, it is clear that doing so caused the proceedings to be drawn out. Thus, we find no abuse of discretion in the court ordering William to contribute $5,000 to Carrie's attorney fees.

## (b) William's Attorney Fees

William also argues that the court erred in failing to award him costs and attorney fees. He contends that "[e]very single position asserted by William was supported by the facts and the law." Brief for appellant at 42.

The district court found that William failed to meet his burden of proof regarding the allegations in his complaint for modification and removal. The court also noted that both parties bore some responsibility for the length of the proceedings. The court then cited to hearings caused by William's refusals to cooperate with opposing counsel, the GAL, and the GAL's counsel in preparing for trial.

We agree with the observations and findings of the district court and thus, we conclude the court did not abuse its discretion in refusing to award William attorney fees and costs.

## (c) Carrie's Attorney Fees

Carrie likewise assigns the district court erred in failing to award her costs and attorney fees. However, as noted above, the district court found that both parties bore some responsibility for the length of the proceedings. Specifically, the court observed that the action was brought on by Carrie's motion alleging parental alienation. Carrie was unable to prove her allegation at trial, despite 3 years of therapeutic intervention and limited contact between William and the children.

While our record demonstrates that perhaps a greater share of the delays lie with William and his aggressive posture toward all parties and the district court, because Carrie was unable to successfully prove the allegations which initiated these proceedings, we cannot say the court abused its discretion in refusing to award Carrie all of her attorney fees and costs. This assignment of error fails.

### 7. Discovery Sanction Barring Paine's Testimony

Finally, Carrie alleges that the district court erred when it did not allow Paine to testify at trial. She argues that William was responsible for the delay of Paine's report, and later for the exclusion of Paine's testimony, "which served to the detriment of only Carrie and the children." Brief for cross-appellant at 36. Carrie contends that because the court barred Paine from presenting testimony at trial, Carrie was prevented from presenting evidence of parental alienation.

Generally, the control of discovery is a matter for judicial discretion, and decisions regarding discovery will be upheld on appeal in the absence of an abuse of discretion. *Nebraska Republican Party v. Shively*, 311 Neb. 160, 971 N.W.2d 128 (2022). Subsection (b)(1) of Rule 35 states in relevant part, "The court on motion may make an order against a party requiring delivery of a report on such terms as are just, and if a physician fails or refuses to make a report, the court may exclude his or her testimony if offered at the trial."

In response to William's motion to discharge Paine as the Rule 35 evaluator, the court initially ordered Paine to submit her child custody evaluation to William and his attorney by October 27, 2020. After a request for an extension by Paine, the court ordered Paine to provide her completed report by November 6. In an order entered on November 12, the court ordered Paine to produce her report within 48 hours of the order or Paine's testimony would be excluded at trial. Paine provided her report to William on November 13, but indicated that an addendum containing a summary and recommendations would follow before November 16. Our record reflects that Paine's addendum was provided to William at the close of business on November 16. Paine failed to timely submit her report as ordered by the district court, despite being warned that such failure would result in the exclusion of her testimony.

William's actions in October 2020, including initiating a civil suit against Paine and her office, and attempting to revoke his informed consent, undoubtedly contributed to the delay in Paine finalizing and submitting her evaluation. William requested the appointment of a Rule 35 evaluator and then attempted to prevent the Rule 35 evaluator from rendering her professional opinion before the court. Carrie fully participated in Paine's evaluation and should not be collaterally penalized by the discovery violation.

During Paine's offer of proof at trial, she stated that she had identified William as the cause of the children's "severe" alienation from Carrie and had personally shared this finding with him in a February 2020 meeting. Paine also described a specific therapeutic intervention for children suffering from parental alienation. Paine's offer of proof went directly to Carrie's allegation of parental alienation by William and her request that the district court order therapeutic services for the family.

Under the circumstances of this case, we find that the district court abused its discretion when it excluded Paine's testimony at trial. As a result, we reverse the district court's exclusion of her testimony, and remand the case to the district court, with directions to allow Paine to testify and to consider Paine's testimony on the issue of Carrie's allegations of parental alienation and request for court-ordered therapeutic services.

### V. CONCLUSION

For the reasons set forth above, we affirm the order of modification related to the children's legal and physical custody, child support obligations, and allocation of fees. We reverse its

decision to exclude Paine's testimony from trial and remand with directions for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.