IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

SHANDERA V. SCHULTZ

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DONALD L. SHANDERA III, APPELLEE,

V.

KAITLYN A. SCHULTZ, NOW KNOWN AS KAITLYN A. WESTON, APPELLANT.

Filed August 22, 2023.    No. A-22-783.

Appeal from the District Court for Washington County: JOHN E. SAMSON, Judge. Affirmed.

Adam R. Little, of Nebraska Legal Group, for appellant.

Nicholas R. Glasz and William Taylor, Senior Certified Law Student, of Glasz Law Firm, for appellee.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Kaitlyn A. Schultz, now known as Kaitlyn A. Weston, appeals the order of the district court for Washington County overruling her amended counter-complaint for modification of custody and removal of her minor child from the jurisdiction. Based on the reasons that follow, we affirm.

## BACKGROUND

On December 2, 2014, the district court entered a decree of paternity and custody, finding Donald L. Shandera III to be the natural father of Austyn M. Shandera, born in 2013. Kaitlyn is Austyn's biological mother. Kaitlyn resided in Texas at the time of the decree, and Donald resided in Nebraska. Donald was awarded sole legal and physical custody of Austyn, and Kaitlyn was awarded parenting time. Kaitlyn appealed the district court's award of custody to Donald, and we affirmed. See *Shandera v. Schultz*, 23 Neb. App. 521, 876 N.W.2d 667 (2016).

On July 11, 2021, Donald filed a complaint for modification alleging there had been a material change in circumstances since the decree was entered and seeking to amend the visitation and parenting plan. Kaitlyn filed an answer and counter-complaint on September 29, and an amended counter-complaint on June 27, 2022. In the amended counter-complaint she alleged that there had been material changes in circumstances since the decree was ordered that warranted modification of the decree. Specifically, she alleged that the material changes included: (1) she had relocated from Texas to Iowa, and was living approximately 2 to 2½ hours from Donald and Austyn, (2) Donald had relocated from Washington County to Saunders County, such that Austyn's school district and living environment had changed, (3) Austyn had aged and matured such that the existing parenting plan was no longer consistent with her best interests, (4) the parties' incomes had changed such that the child support calculation would result in a change of more than 10 percent, (5) Donald's co-parenting skills had changed such that the current parenting plan was no longer in Austyn's best interests, and (6) the parties' respective living environments had changed. Kaitlyn asked the court to modify the decree to award her sole physical custody of Austyn and to grant her permission to remove Austyn to Iowa. She also sought full legal custody of Austyn, or in the alternative, joint legal custody.

Trial was held on Donald's complaint and Kaitlyn's amended counter-complaint in August 2022. The evidence at trial showed that Donald was living in Ashland, Nebraska, with Austyn, his wife Colleen, and his stepson, Triston, who was 12 years old at the time of trial. Donald and Colleen had been married for 5 years. At the time of the original decree Donald lived in Blair, Nebraska. He moved to Ashland to start his own construction business. By owning his own business, he has flexibility in his work hours and is home when Austyn goes to school and comes home from school.

Donald testified that Austyn has friends in the neighborhood. She also has aunts, uncles, and cousins who live within a 10-minute drive of Donald's home. Donald also has a sister who lives in Lincoln, Nebraska. Austyn spends time with her relatives that live nearby on a regular basis.

Kaitlyn had moved multiple times since the decree was entered. Kaitlin lived in Texas at the time of the decree and stayed there for 6 years. She then moved to Oregon for 2 months, moved back to Texas for 4 to 5 months, and then moved to La Vista, Nebraska. In October 2019, after living in La Vista for 6 months, she got engaged to Ryan Weston and moved to West Des Moines, Iowa, to be with him. At the time of trial she continued to live in West Des Moines and was married to Ryan. Donald testified it takes 2 hours and 40 minutes to drive from Ashland to West Des Moines.

Kaitlyn testified that changes since the initial decree include her relocation to West Des Moines and her marriage to Ryan. She testified that Ryan's income gives her more money to put toward Austyn and her well-being, as well as allowing her to spend more on extracurriculars and activities for Austyn. Kaitlyn also testified she was working as a nurse and her job was stable and there was potential for growth. She was also earning more income than she did in Texas and had affordable health insurance. She further stated that at the time of the decree she was living paycheck to paycheck, and that was no longer the case. She believed her current circumstances were an improvement in her living situation and in her ability to provide for Austyn. Kaitlyn and

Ryan have a house in West Des Moines, where Austyn has her own bedroom, as well as a big yard and a park close by. Kaitlyn does not have any family in West Des Moines.

At the time of trial Austyn had been in the Ashland-Greenwood school district for two years. Donald testified that she was doing well in school with some extra help. Her teacher suggested the use of a tutor at school for reading and math. Kaitlyn and Donald discussed it and agreed that it would be good for Austyn. Donald also testified that both he and Kaitlyn received a letter from the school recommending that Austyn enroll in summer school. Kaitlyn testified that Donald told her he was going to enroll Austyn in summer school without discussing it with her. Donald did not dispute that occurred. Kaitlyn did not oppose Austyn being in summer school but thought Donald should have discussed it with her first. The evidence also showed that both parties have regular communication with Austyn's teachers and have access to information and communication from her school.

Both parties presented evidence regarding two sexual incidents that occurred between Austyn and other minors. The first incident happened during Kaitlyn's parenting time and involved inappropriate touching between Austyn and another minor child. Austyn was interviewed at Project Harmony and the incident was found to be harmless exploration by the minors. Kaitlyn testified that Project Harmony suggested that Austyn start therapy, not necessarily because of the sexual incident, but because going between two different households can be difficult for a child. Kaitlyn testified that she wanted to put Austyn in therapy and talked to Donald about it, but he did not feel it was necessary at the time.

The second incident occurred in July 2021 when Austyn was in Donald's custody. Austyn had inappropriate sexual contact with her five-year-old cousin at Donald's sister's house in Lincoln. Donald testified he called Kaitlyn right after he learned about the incident from his sister. Donald also contacted Child Protective Services and the police department as well.

At the recommendation of the Department of Health and Human Services (DHHS) and Project Harmony, Donald enrolled Austyn in therapy. However, therapy did not start until several months after the incident because Donald could not find a therapist to see Austyn earlier due to COVID restrictions. Donald did not notify Kaitlyn before Austyn's initial therapy appointment and did not give her therapy updates. Donald testified that Austyn's therapist advised him not to communicate about therapy with Kaitlyn. By the time of trial, Austyn had completed therapy and was discharged.

Kaitlyn did not disagree that Austyn needed therapy, but claimed it was wrong that she did not know anything about Austyn's treatment plan. She did not even know the name of the therapist. She testified that she asked Donald for information about Austyn's therapy multiple times.

Following the incident in July 2021, Donald filed a motion to have Kaitlyn's parenting time temporarily terminated based on her response upon learning about the sexual incident. At the time the parties learned of the incident, Kaitlyn and Ryan's wedding in the Virgin Islands was a few days away and they were scheduled to fly there the next day. Austyn was going with them. Based on the sexual incident, Donald wanted Austyn to stay home because he thought the sexual incident needed to be addressed. He claimed that Kaitlyn did not want to delay the wedding or leave Austyn behind and chose to go ahead with her wedding rather than addressing what had occurred with Austyn. Austyn went to the Virgin Islands with Kaitlyn and Ryan and upon her return, the parties took Austyn to Project Harmony.

Donald's sister whose daughter was assaulted by Austyn, testified that when Kaitlyn first heard about the sexual assault, she told Austyn she did nothing wrong and that she was the victim. The sister also stated that Kaitlyn's wedding was more important to her than getting Austyn help. She also stated she was concerned that Kaitlyn is a mandatory reporter of sexual assault because she is a nurse and did not take the situation seriously.

Kaitlyn's husband, Ryan, testified that Kaitlyn was not dismissive of the sexual allegations and took them seriously. He also testified that Kaitlyn called Child Protective Services after she learned about the incident.

Austyn was also caught stealing small items on several occasions in the year before trial, and all instances occurred when Austyn was in Donald's care. Donald testified that in response to her stealing he would either take items or activities away from her. He also testified that he talked to Kaitlyn about Austyn's stealing and they tried to figure out what to do. Donald acknowledged that at one point he told Austyn that the punishment for stealing in some countries is to cut the person's hand off. He denied suggesting that Austyn should watch a video of someone having his or her hand cut off. Donald testified that Austyn is no longer stealing.

Kaitlyn testified that one reason custody should be modified is because Austyn is getting older and needs to be with her mother when she goes through puberty. She stated that Donald is not fit to provide for Austyn's health and maintenance during puberty. Specifically, Kaitlyn stated Austyn will need help with such items as bras and feminine hygiene products. Donald testified that Austyn has a good relationship with Colleen, and Austyn could talk to her about female issues if Kaitlyn was not available. Kaitlyn agreed that Austyn has a good relationship with Colleen as far as she knew.

When asked if Donald effectively co-parents with her, Kaitlyn responded "sometimes." She stated that Austyn's general health and welfare is stable with Donald. Kaitlyn agreed that Donald had been providing appropriate health, maintenance, and support for Austyn, and satisfies her educational needs. She testified that Austyn and Donald have a close relationship, but also testified that she and Austyn also have a close relationship.

Kaitlyn's concerns about Donald's parenting included him taking Austyn to construction job sites, which she believes is dangerous and puts Austyn at risk for harm. She also testified that Donald can be a little "rough" and sometimes has a temper. Kaitlyn testified that during the timeframe that Austyn was stealing, Donald had suggested having Austyn watch a video of someone's hand getting cut off. She claimed this was mental abuse. She did not allege any other instances of mental or physical abuse or neglect.

Following trial, regarding Donald's complaint for modification, the court entered an order finding that Kaitlyn's relocation to a residence two hours from Austyn was a material change in circumstances warranting a change in the parenting plan and that it was in Austyn's best interests to amend Kaitlyn's parenting time and the parenting plan. Regarding Kaitlyn's amended counter-complaint, the court found that Kaitlyn had not met her burden to show a material change in circumstances since the decree and had not met her burden to show it was in Austyn's best interests to modify legal and physical custody. Having concluded that Kaitlyn did not meet her burden to show a material change in circumstance or that a modification of custody was in Austyn's best interests, the district court stated it was not necessary to conduct an analysis regarding whether removal from the jurisdiction was appropriate.

ASSIGNMENTS OF ERROR

Kaitlyn assigns that the district court erred in (1) finding she did not prove a material change in circumstances, (2) declining to modify physical custody consistent with the child's best interests, and (3) failing to conduct a full removal analysis where the evidence demonstrated removal was in the child's best interests.

STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Winkler v. Winkler*, 31 Neb. App. 162, 978 N.W.2d 346 (2022).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

Kaitlyn, as the noncustodial parent, sought to modify the decree to award her physical custody of Austyn while simultaneously requesting to move the child out of state. In cases where a noncustodial parent is seeking sole custody of a minor child while simultaneously seeking to remove the child from the jurisdiction, a court should first consider whether a material change in circumstances has occurred and, if so, whether a change in custody is in the child's best interests. If this burden is met, then the court must make a determination of whether removal from the jurisdiction is appropriate. *Burton v. Schlegel*, 29 Neb. App. 393, 954 N.W.2d 645 (2021).

*Modification of Custody.*

Modifying a custody or parenting time order requires two steps of proof. *Winkler v. Winkler, supra*. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.* Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Id.*

Kaitlyn first assigns that the district court erred in finding she did not prove a material change in circumstances. Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). In cases involving the modification of child custody, a material change of circumstances constituting grounds for modification means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Burton v. Schlegel, supra*. The Nebraska Supreme Court has further explained: "[B]y material change of circumstances we mean that the evidence must show that something has occurred, which if the trial court had been aware of the existence of these circumstances initially,

the trial court in the best interests of the children would have granted their custody to the other parent." *Hoschar v. Hoschar*, 220 Neb. 913, 915, 374 N.W.2d 64, 66 (1985), *disapproved on other grounds, Parker v. Parker*, 234 Neb. 167, 449 N.W.2d 553 (1989). The party seeking modification of child custody bears the burden of showing a material change in circumstances. *Schrag v. Spear, supra.*

Kaitlyn argues that a material change in circumstances existed in that both parties had moved since the decree was entered and their living environments had changed. The evidence showed that Donald had moved once within Nebraska since the decree was entered. His move from Blair to Ashland was due to his desire to start his own construction business, which gives him flexibility in caring for Austyn. Austyn was in a different school district than at the time of the original decree, but she was getting the extra help she needed in school and was doing well. Donald had multiple relatives that live near him, just as he did at the time of the decree, and Austyn often spends time with them.

Kaitlyn lived much closer to Donald than she did at the time of the decree, but she had moved multiple times between several states before settling in West Des Moines. She was now married to Ryan and had more financial security than she did on her own. Kaitlyn also testified she had a stable job and was earning more income than she did in Texas. Kaitlyn's living conditions had improved from when she was in Texas. She and Ryan have a house where Austyn has her own bedroom and places to play, whereas she lived in an apartment in Texas. Kaitlyn's move to West Des Moines would also allow Austyn closer access to her extended family on Donald's side than when Kaitlyn was in Texas.

Despite the changes in the locations of the parties' residences and some changes in their living environments, we cannot say that had the trial court been aware of the existence of these circumstances initially, it would have been persuaded to grant physical custody to Kaitlyn. At the time of the original decree, the court did not find Kaitlyn credible and was critical of her reasons for moving to Texas, finding that her motivation was to make herself happy, with little consideration for the best interests of Austyn. The court was also concerned that Kaitlyn had stopped taking her psychotropic drugs for attention deficit disorder and anxiety without consulting a doctor and she did not have a psychiatrist in Texas. The trial court also found that Austyn being in Nebraska with Donald was more beneficial to Austyn. Specifically, it found that the Blair school district was above average, Donald had better living conditions, Austyn had numerous extended family members within two hours of Donald's home, and Donald could provide Austyn more stability than Kaitlyn. Although some of the factors considered by the trial court in determining custody originally had changed and no longer weighed in Donald's favor, we conclude that Kaitlyn's lack of veracity, decision making, and failure to take her medication without consulting a doctor supports our conclusion that the court's original custody determination would not have been different had Kaitlyn lived in West Des Moines. Kaitlyn has failed to show a material change in circumstances that has affected Austyn's best interests.

Kaitlyn next argues that Donald's co-parenting skills, specifically communication and cooperation, had changed resulting in a material change in circumstances. Kaitlyn testified that she wanted Austyn to start therapy after the first sexual incident, but Donald refused. When Donald enrolled Austyn in therapy after the second sexual incident, he did not notify Kaitlyn of her initial appointment or provide updates. She testified that she did not know any details about therapy,

including the name of the therapist, despite requesting information multiple times. Donald testified that he was advised by Austyn's therapist to not share information about Austyn's therapy.

There was also disagreement between the parties regarding Austyn going with Kaitlyn to her wedding right after the parties learned about the second sexual incident. Donald did not want Austyn to go and testified that Kaitlyn was putting her needs above Austyn's. Kaitlyn further testified that Donald did not discuss enrolling Austyn in summer school before doing so. He simply told Kaitlyn he had enrolled her in the program.

The original decree gave Donald "primacy in the choices regarding the [child's] education, religious upbringing, and medical needs." The issues that Kaitlyn raised regarding Donald's co-parenting involve Austyn's medical and education needs, making Donald the primary decision maker. Therefore, Kaitlyn has failed to show that Donald's co-parenting behavior presents a material change in circumstances affecting the best interests of Austyn.

For the reasons stated above, there is no material change in circumstance to warrant modification of physical custody. Kaitlyn's first assignment of error fails.

Having found that Kaitlyn did not prove a material change in circumstances, we need not address Kaitlyn's assignment that the district court erred in failing to find that it was in Austyn's best interests to modify physical custody.

*Removal Analysis.*

Kaitlyn also assigns that the district court erred in failing to conduct a full removal analysis. The district court found that it was unnecessary to review whether removing Austyn from the jurisdiction was appropriate because Kaitlyn did not meet her burden to prove that custody should be modified. Having concluded that the district court did not err in finding no material change in circumstance existed to warrant modification of physical custody, we agree that it was unnecessary for the court to conduct a removal analysis. This assignment of error fails.

CONCLUSION

For the foregoing reasons, we conclude that the district court did not abuse its discretion in denying Kaitlyn's amended counter-complaint to modify custody and to remove Austyn from the jurisdiction. Accordingly, the order of the district court is affirmed.

AFFIRMED.